**In re Melvin Arthur DOTY and Walter Eugene Doty aka Doty Bros., an Ind. Gen. Partner, Debtors.**

**Bankruptcy No. 86–62139.**

United States Bankruptcy Court, N.D. Indiana, Hammond Division, at Gary.

Feb. 9, 1991.

Edward Ummel, Plymouth, Ind., for the debtor.

Edward Chosniek, Lafayette, Ind., for the creditor, Farm Credit Services, Inc.

## MEMORANDUM OPINION AND ORDER

KENT LINDQUIST, Chief Judge.

### I

*Statement of Proceedings*

This Chapter 11 case comes before the Court on Motion filed on August 15, 1990 by Farm Credit Services of Mid–America, ACA (hereinafter: "FCS") for Interpretation of Confirmed Plan and for Determination of Payments due Unsecured Creditors for Crop Year 1989 pursuant to Amended Plan and Disclosure Statement filed by the Debtors on August 19, 1988, which was modified by an agreed immaterial modification filed on December 27, 1988, and which was confirmed by Order of Court dated December 30, 1988 (hereinafter: "Motion").

The Motion of FCS asserts that it is the holder of a secured claim in the sum of $332,500.00, and is also the holder of an unsecured claim in the sum of $81,057.67.

The Motion of the FCS further asserts that Clause 6.9 of Amended Plan provides as follows to the treatment of unsecured creditors:

6.9 Class 9 claims, all other unsecured creditors, along with deficiencies of the unsecured creditors, shall be approximately One Hundred Fifty Thousand Sixty-five Dollars and Thirty-two Cents ($150,065.32), as follows:

| | |
|---|---|
| Federal Land Bank | $ 96,057.67 |
| 1st National Bank of Monterey | 5,650.00 |
| Buckeye Ag–Center | 1,283.96 |
| Carl T. Doty | 17,829.90 |
| Jerry Eckert | 2,162.50 |
| Garst Seed Company | 531.00 |
| Cooperative Elevator | 616.98 |
| Knox Implement | 5,410.34 |
| Michael McNeal | 300.00 |
| Pulaski County Farm Bureau | 4,108.00 |
| Steiner Financial Corporation | 13,889.00 |
| Winclair Petroleum | 2,225.97 |
| TOTAL | $150,065.32 |

*The Debtors propose to pay them a dividend of approximately One Hundred Sixty-six Thousand Six Hundred Forty-two Dollars and Thirty-two Cents ($166,642.32), which will be paid in five*

*(5) annual installments beginning either thirty (30) days after the confirmation, or February 10, 1989, whichever occurs last, as more specifically set forth in the cash flows attached hereto as "Exhibit C" and "Exhibit D". These payments will be made on or before the 10th day of February of each year hereafter. They will be paid after payment of all secured and priority claims as set forth hereinabove.* (Emphasis supplied).

Exhibits "C" and "D" are not attached to the original copy of the Amended Plan which is attached as Exhibit "E" to the Amended Disclosure Statement filed August 19, 1988. However, Exhibits "C" and "D" are attached to the Amended Disclosure Statement.

The Motion of FCS further asserts that the Court by Order entered on November 2, 1988 approved the Debtors' Amended Disclosure Statement filed on August 19, 1988, which provides in its relevant part as follows at Clause 6, Summary of Plan:

Finally, all other unsecured claims, along with deficiencies of the secured creditors, shall be approximately One Hundred Fifty Thousand sixty-five Dollars and Thirty-two Cents ($150,065.32), as follows:

| | |
|---|---|
| Federal Land Bank | $ 96,057.67 |
| 1st National Bank of Monterey | 5,650.00 |
| Buckeye Ag–Center | 1,283.96 |
| Carl T. Doty | 17,829.90 |
| Jerry Eckert | 2,162.50 |
| Garst Seed Company | 531.00 |
| Cooperative Elevator | 616.98 |
| Knox Implement | 5,410.34 |
| Michael McNeal | 300.00 |
| Pulaski County Farm Bureau | 4,108.00 |
| Steiner Financial Corporation | 13,889.00 |
| Winclair Petroleum | 2,225.97 |
| TOTAL | $150,065.32 |

*The Debtors propose to pay them a dividend of approximately One Hundred Sixty-six Thousand six Hundred Forty-two dollars and Thirty-two Cents ($166,642.32), which will be paid in five (5) annual installments beginning either thirty (30) days after the confirmation, or February 10, 1989, whichever occurs last, as more specifically set forth in the cash flows attached hereto as "Exhibit C" and "Exhibit D". These payments will be made on or before the 10th day of February of each year hereafter. They will be paid after payment of all se-*

*cured and priority claims as set forth hereinabove.*

*The treatment provided above will be payment in full of all claims.* A projected cash flow and crop plan for the 1988 crop year, and the 1989 through 1992 crop years are attached hereto and made a part hereof as "Exhibit C" and "Exhibit D", respectively. (Emphasis supplied).

Exhibit "C" to the Amended Disclosure Statement sets out a projected 1988 cash flow statement for the Debtors, which in a condensed form stated as follows:

| | | |
|---|---|---|
| Beginning Balance | 8/15/88 | $ 12,893.28 |
| Anticipated Income | 8/15/88–12/31/88 | $116,558.00 |
| Less: | | |
| Anticipated Exp. | 8/15/88–12/31/88 | $ 27,844.00 |
| Less: | | |
| Cash Reserve for planting 1989 Crops | | $ 21,000.00 |
| Net Profits Available for Distribution | | $ 80,607.28 |
| Less: | | |
| Estimated Administrative Claims and Annual payments to secured creditors | | $ 61,000.00 |
| Total available for distribution to Unsecured Creditors | | $ 19,607.28 |
| Unsecured Distribution percentage percentage—1988 | | 13% |

Exhibit "D" to the Amended disclosure Statement sets out a projected 1989–1992 cash flow statement for the Debtors, which in a condensed form stated as follows:

| | |
|---|---|
| Beginning Balance January 1 (Cash reserve from previous year) | $ 21,000.00 |
| Income | $157,300.00 |
| Less: | |
| Expenses and Cash reserve for following year's crop | $ 86,400.00 |
| Net Profits Available for Distribution | $ 91,900.00 |
| Less: | |
| Administrative Claims and Secured Claims | $ 55,141.24 |
| Total Distribution to Unsecured Creditors | $ 36,758.76 |
| Unsecured Distribution Percentage | 24.5% |
| Total Percentage over 5 year plan | 111% |

(Emphasis supplied)

This Amended Disclosure Statement was approved by the Court without objection on November 2, 1988.

The Motion of FCS further asserts that the Amended Disclosure Statement and Amended Plan contemplates that "full payments" be distributed to unsecured creditors, that a demand was made by FCS on the Debtors for an $8,500.00 payment due February 10, 1989, and for a $16,211.57 payment due February 10, 1990, and that the Debtors contend that the Amended Plan provides only for a pro rata distribu-tion of net profits of Debtors, and there were no net profits for 1988 and 1989.

As a consequence, FCS requests that the Court enter an order interpreting and clarifying the Debtors' confirmed plan regarding its intended treatment of unsecured claims. In addition, FCS requests that if the Debtors are only obligated to pay a dividend only out of the net profits on unsecured claims, that a disclosure of the Debtors financial affairs, properly adjusted, will show that the Debtors did in fact have net profits for the year 1989, and should be required to pay the same to unsecured creditors.

Pursuant to status conference held on October 17, 1990, the Debtors were ordered to file a response thereto.

On October 22, 1990, the Debtors filed their Response to the Motion of the FCS.

The response asserts that the Order Confirming the Amended Plan on December 30, 1988 is clear and unambiguous, in that paragraph three (3) thereof specifically provides as follows:

That the revised amount of claims due to the unsecured creditors as set forth above are hereby approved, with *said unsecured creditors to receive annually for five (5) years all of the net profits (after priority claims, secured claims, operating expenses and living expenses) to be divided pro rata among the creditors pursuant to the above claim amounts.* (Emphasis supplied).

The Debtors assert that FCS is now attempting to revoke the Order Confirming the Amended Plan by alleging that the Amended Plan provides for a guaranteed minimum payment based on the anticipated cash flow charts attached to the Amended Plan as Exhibits "C" and "D", and that any ambiguity that FCS may attempt to attribute to the Amended Plan was resolved by the above provision in the Order.

The Debtors further assert that the Order Confirming the Plan was distributed to all creditors on January 3, 1989, and Bankr.R. 9024 provides that a complaint to revoke an order confirming a plan must be filed within the time allowed by 11 U.S.C.

§ 1144 which provides that a request to revoke an order of confirmation must be made before 180 days after the entry of the order confirming the plan, and the order can only be revoked if such order was procured by fraud. Thus, according to the Debtors the Order Confirming the Amended Plan is *res judicata* on the issue, and cannot be revoked.

The Court takes judicial notice of the fact that on April 17, 1989, or after the Order confirming the Debtors' Plan was entered on December 30, 1988, the Court ordered the Debtors to file a post-confirmation report pursuant to Bankr.R. 2015(a)(6).

On August 1, 1989, the Debtors filed a statement that the Plan had been substantially consummated,[1] and applied for a final decree pursuant to Bankr.R. 2015(a)(7) on that same date. The Debtor also filed a statement of payments made or projected to be made under the Plan on August 1, 1989.

After notice and opportunity for hearing thereon was given to all creditors pursuant to Certificate of Service filed by Debtors on August 23, 1989, there being no objections thereto, or any request for a hearing thereon, the Court entered a Final Decree on September 28, 1989, and the case was closed on that same date pursuant to the terms of the Final Decree.

Although FCS has filed its Motion on August 15, 1990, the case had been closed pursuant to § 350(a), a final decree entered pursuant to Bankr.R. 3022, and the case has not been reopened pursuant to § 350(b), and Bankr.R. 5010.

The Order confirming the Amended Plan did not provide for the retention of jurisdiction by the Court. However, Article VIII of the Amended Plan at Clause 8.1.3 expressly provides that the Court shall retain jurisdiction after confirmation to hear and determine any dispute arising under the Plan, and the final decree closing the estate on September 28, 1989 pursuant to Bankr.R. 3022, does provide for the retention of jurisdiction by the Court, at paragraph five thereof, which provides as follows:

---

1. Pursuant to 11 U.S.C. § 1101(2), "substantial consummation" means:

    (A) transfer of all or substantially all of the property proposed by the plan to be transferred;

    (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

    (C) commencement of distribution under the plan.

The statute is written in the conjunctive. Thus, all three elements clearly must be met in order to reach a determination that a plan has been substantially consummated. *In re Coffee Cupboard, Inc.,* 118 B.R. 197, 200 (Bankr. E.D.N.Y.1990); *In re Bedford Springs Hotel, Inc.,* 99 B.R. 302, 303 (Bankr.W.D.Pa.1989); *U.S. v. Novak,* 86 B.R. 625, 628 (D.S.D.1988); *In re Hayball Trucking, Inc.,* 67 B.R. 681 (Bankr. E.D.Mich.1986); *In re Gene Dunavant and Son Dairy,* 75 B.R. 328, 332 (M.D.Tenn.1987).

The reference to a transfer of all or substantially all of the property proposed by the plan to be transferred as stated in subsection (A) of § 1102(2) has significance only when the plan calls for the transfer of property in addition to the distribution of dividends to creditors. If the plan does not call for any property transfers and the Debtor continues to manage the property dealt with under the plan, there is no additional percentage of payments test to be applied in determining substantial confirmation if a confirmed plan has accrued; the only requirement is the commencement of a distribution within the plan. *In re Fansal Shoe Corporation,* 119 B.R. 28, 29–30 (Bankr.S.D.N.Y.1990).

It should also be noted that 11 U.S.C. § 1127(b) provides as follows:

    (b) The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

Thus, if a confirmed plan has been substantially consummated as defined in § 1101(2), it may not be modified pursuant to § 1127(b). *See, e.g., In re U.S. Repeating Arms Co.,* 98 B.R. 138, 140 (Bankr.D.Conn.1989); *In re Charter Co.,* 97 B.R. 645, 647 (Bankr.M.D.Fla.1989); *In re Northampton Corp.,* 59 B.R. 963, 968–69 (E.D.Pa.1984); *U.S. v. Novak,* 86 B.R. 625, 631 (D.S.D.1988); *In re University Cafeteria, Inc.,* 47 B.R. 404, 405 (W.D.Va.1985); *In re Earley,* 74 B.R. 560, 563 (Bankr.C.D.Ill.1987); *In re Hayball Trucking, Inc.,* 67 B.R. 681, 684 (Bankr. E.D.Mich.1986); *In re Charterhouse, Inc.,* 84 B.R. 147, 161 (Bankr.D.Minn.1988).

5. The Court expressly retains jurisdiction over this case to protect the confirmation order, to prevent interference with the execution of the plan, to see that the plan is properly consummated and to otherwise aid in its operation.

## II

*Conclusions of Law and Discussion*

■ The initial question is whether this case must be reopened before the Court has jurisdiction, after the Amended Plan has been confirmed and the case has been closed, to act on FCS's Motion, and the Debtor's Response thereto, when the order confirming the Debtors' Plan does not provide for retention of jurisdiction by the Court, but the Amended Plan as confirmed and the Final Decree closing the case expressly reserves jurisdiction of the Court over the case.

In addition, if the case must be reopened in order for this Court to assume jurisdiction must a filing fee be paid pursuant to 28 U.S.C. § 1930(b)?

Section 1142 of Title 11 provides as follows:

**§ 1142. Implementation of plan.**

(a) Notwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition, the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court.

(b) The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan.

Collier on Bankruptcy in analyzing this Section states as follows:

Section 1142(a) is derived from Section 224(2) of the Bankruptcy Act which provided that:

"Upon confirmation of a plan—

"(2) the debtor and every other corporation organized or to be organized for the purpose of carrying out the plan shall comply with the provisions of the plan and with all orders of the court relative thereto and shall take all action necessary to carry out the plan, including, in the case of a public-utility corporation, the procuring of authorization, approval, or consent of each commission having regulatory jurisdiction over the debtor or such other corporation ..."

However the Code departs from Chapter X by mandating compliance with the terms of the plan notwithstanding "any other applicable nonbankruptcy law, rule, or regulation relating to financial condition." Thus if the debtor cannot comply with net capital or reserve rules which would otherwise serve as cause for regulatory authorities to shut down the business and if the debtor operates the reorganized entity in accordance with the plan, regulatory authorities arguably are bound by the plan to permit such operation.

Section 1142(a) does not apply, however, to contractual obligations which are assumed by the debtor during the case or under the plan. If a contract between the debtor and a creditor has financial conditions and the debtor leaves the creditor unimpaired under section 1124, the debtor must comply with the financial conditions of the contract after confirmation.

**[1]–Jurisdiction of the Court.**

Chapter 11 of the Code does not include any reference to a "final decree" as did Chapter X of the Act. Section 229(b) of the Bankruptcy Act authorized application for an order declaring the Chapter X plan to have been substantially consummated. Chapter X Rule 10–309(b) provided that:

"On consummation of the plan, the court shall enter a final decree which shall contain provisions (1) stating the effect of confirmation and consummation on the creditors and stockholders

of the debtor; (2) discharging the trustee, if any; (3) making such provisions by way of injunction or otherwise as may be equitable; and (4) closing the estate."

As the 14th edition of *Collier on Bankruptcy* stated:

"Since final decree terminates the case, it is generally desirable that the court at least reserve jurisdiction to make such orders as may be necessary or proper in carrying out or effecting the terms of the plan or to enforce the order of confirmation, and to permanently enjoin all action interfering with the reorganization and all creditors and stockholders from in any way interfering with the plan ...

"Where the final decree contains no reservation, the question may arise as to whether the court later has jurisdiction to act at all, even on a matter connected with the plan. The better view seems to be that jurisdiction of the Chapter X court continues after the final decree, whether expressly reserved or not, as to questions involving the interpretation operation and administration of the plan."

Although chapter 11 does not provide for a final decree, section 350 requires the court to enter an order closing the case "after an estate is fully administered and the court has discharged the trustee." Thus section 1142(a) should be considered in terms of its relationship to section 350(a).

So long as a chapter 11 case is "open," there does not appear to be any limit on the court's jurisdiction under 28 U.S.C. § 1334(b) with respect to civil proceedings arising under title 11 or arising in or related to cases under title 11.

Therefore the rather broad declarative statement in section 1142(a) that "the debtor ... shall comply with any orders of the court," when read in the full context of section 1142(a), is arguably superfluous since the debtor must comply with any order of the bankruptcy court so long as the court has jurisdiction over the subject matter. Prior to the closing of the case, the court clearly has jurisdic-

tion with respect to any matter arising in or related to the case.

The issue which sections 350 and 1142 raise is whether the court may enter an order under section 1142(a) with respect to a plan in a closed case without reopening the case under section 350(b). While the language of section 1142(a) raises the issue, that language does not clearly resolve the question although the broad language of the subsection may reasonably be interpreted to give the court jurisdiction to construe and enforce the terms of a plan *after* an order is entered under section 350(a) closing a case, without requiring the court to reopen the case under section 350(b).

In summary, section 1142(a) appears generally to follow Chapter X practice and should be interpreted in a matter consistent with Chapter X precedents.

As the 14th edition of *Collier on Bankruptcy* noted:

"In most cases, it is considered the better practice for the reorganization court, in confirming the plan, to reserve expressly the jurisdiction to protect the confirmation decree, to prevent interference with the execution of the plan, and otherwise to aid in its operation. This jurisdiction is complementary to that of confirming the plan and auxiliary to it, and is for the purpose of seeing that the plan is properly consummated. Thus, under such a reservation and the terms of § 224(2), the reorganization court may: order an accounting of funds not properly distributed; enforce causes of action as provided for in the plan and prevent any interference therewith; enjoin any act inconsistent with or which will interfere with the execution of the plan; entertain a motion for leave to file an application charging trustees acting under a trust agreement in the plan with irregularities; order an accounting by voting trustees provided for in the plan and consider their removal for failure to carry out the plan; modify the plan; authorize the debtor's successor to take any steps necessary for

the recovery of a fund to which the successor was given title by the plan; and determine summarily the liability of the debtor's successor company for taxes assumed under the terms of the plan. But a general reservation of jurisdiction, of the kind previously stated, will not alone justify the court in reopening a bar order for the filing of claims and extending that time so that a claim may be filed after confirmation.

Chapter 11 of the Code does not address the issue of the proper time for issuance of a final decree in a chapter 11 case. Bankruptcy Rule 3022 provides that:

"After an estate is fully administered, including distribution of any deposit required by the plan, the court shall enter a final decree (1) discharging any trustee if not previously discharged and cancelling his bond; (2) making provision by way of injunction or otherwise as may be equitable; and (3) closing the case."

5 *Collier on Bankruptcy*, ¶ 1142.01, pp. 1142-1-5 (L. King. 15th ed.) (footnotes omitted).

Section 350(b) of title 11 provides as follows:

(b) A case may be reopened in the court in which the case was closed to administer assets, to accord relief to the debtor, or for other cause.

Section 105(a) of title 11 states as follows:

§ 105. Power of court.

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provisions of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

Pursuant to 11 U.S.C. § 103(a) except as provided in § 1161, Chapters 1, 3 and 5 apply in a case under title 11.

Thus, the Court is authorized to act *sua sponte* as to reopening a case. *See, In re Searles,* 70 B.R. 266, 271 (D.R.I.1987); *In re Tall,* 79 B.R. 291, 293 (Bankr.S.D.Ohio 1987); *In re Warren,* 24 B.R. 846, 847 (Bankr.W.D.Ky.1982); *see also, In re Thomas,* 204 F.2d 788 (7th Cir.1953) (Act case); *In re Mullendore,* 741 F.2d 306, 308-9 (10th Cir.1984) (construing former Rule 515).

Section 350(b) is implemented by Bankr.R. 5010, which provides as follows:

Rule 5010. Reopening Cases.

A case may be reopened on motion of the debtor or other party in interest pursuant to § 350(b) of the Code. In a chapter 7 or 13 case a trustee shall be appointed unless the court determines that a trustee is not necessary to protect the interests of creditors and the debtor or to insure efficient administration of the case.

In addition, Bankr.R. 9024 provides as follows:

Rule 9024. Relief from Judgment or Order.

Rule 60 FR Civ P applies in cases under the Code except that (1) *a motion to reopen a case under the Code* or for the reconsideration of an order allowing or disallowing a claim against the estate entered without a contest *is not subject to the one year limitation prescribed in Rule 60(b),* (2) a complaint to revoke a discharge in a chapter 7 liquidation case may be filed only within the time allowed by § 727(e) of the code, and (3) a complaint to revoke an order confirming a plan may be filed only within the time allowed by § 1144 or § 1330. (Emphasis supplied).

Bankruptcy Rule 9024, which incorporates Fed.R.Civ.P. 60, thus exempts motions to reopen cases under the Code from the one year limitation of Rule 60(b). Accordingly, even though the Final Decree closing this case was entered on September 28, 1989, or over one year ago, the Court may still reopen this case, and act on FCS' Motion if it addresses a post confirmation dispute as to the interpretation, administra-

tion, execution, and enforcement of the Confirmation Order and/or the Amended Plan as confirmed.

Because the Motion of FCS relates directly to what debts or to the extent certain debts are discharged pursuant to the Order confirming the Debtor's Amended Plan and/or the terms and conditions of the Debtor's Amended Plan as confirmed, the Court holds that it may reopen this case, *sua sponte* pursuant to § 350(b), § 105(a), and Bankr.R. 5010.

■ The next question is whether costs should be assessed pursuant to the Bankruptcy Court Fee Schedule, 28 U.S.C. § 1930, and the Schedule of Fees promulgated by the Judicial Conference of the United States pursuant to 28 U.S.C. § 1930(b). The Language to Clarify Reopened and Converted Bankruptcy Code Cases found in the Fee Schedule states as follows:

Language To Clarify Reopened and Converted Bankruptcy Code Cases.

(a) Filing fee prescribed by 28 U.S.C. § 1930(a) must be collected when a Bankruptcy Code case is reopened, unless the reopening is to correct an administrative error or for actions related to the debtor's discharge. If a Bankruptcy Code case is reopened for any other purpose, the appropriate fee to be charged is the same as the filing fee in effect for commencing a new case on the date of reopening.

The Court concludes that since this matter relates to the Debtor's discharge, no fee shall be charged to reopen this case.

The Court now turns to the merits of the case as to the Debtor's confirmed plan and the Motion of the FCS.

As stated by the Court in *In re Glow,* 111 B.R. 209 (Bankr.N.D.Ind.1990):

The confirmation of a plan binds both the debtor and his creditors to the plan provisions. *United States of America v. Norton,* 717 F.2d 767 (3rd Cir.1983); *Matter of Gregory,* 705 F.2d 1118 (9th Cir.1983); *In re Wickersheim,* 107 B.R. 177, 181 (Bankr.E.D.Wis.1989); *Matter of Grogg Farms, Inc.,* 91 B.R. 482, 485

(Bankr.N.D.Ind.1988); *In re Mikrut,* 79 B.R. 404, 406 (Bankr.W.D.Wis.1987); *In re Kitchen,* 64 B.R. 452, 454 (Bankr. D.Mont.1986); *Matter of Abercrombie,* 39 B.R. 178, 179 (Bankr.N.D.Ga.1984).

Once a plan is confirmed neither a debtor nor a creditor can assert rights that are inconsistent with its provisions. *Matter of Grogg Farms, Inc.,* 91 B.R. at 485, *supra; In re Evans,* 30 B.R. 530, 531 (B.A.P. 9th Cir.1983).

An order of confirmation constitutes *res judicata* as to all issues that could have and should have been raised pertaining to the plan. *In re Patterson,* 107 B.R. 576, 578–79 (Bankr.S.D.Ohio 1979); *In re Wickersheim,* 107 B.R. at 181, *supra; Matter of Grogg Farms, Inc.,* 91 B.R. at 485, *supra; In re Bonanno,* 78 B.R. 52, 55 (Bankr.E.D.Pa.1987); *In re Earley,* 74 B.R. 560, 562 (Bankr.C.D.Ill. 1987); *In re Kitchen,* 64 B.R. 452, 454–55 (Bankr.D.Mont.1986); *In re Lewis,* 64 B.R. 415 (Bankr.E.D.Pa.1986) *aff'd* 85 B.R. 719 (E.D.Pa.1988); *In re Evans,* 30 B.R. 530, 531–32 (B.A.P. 9th Cir.1983); *In re Russell,* 29 B.R. 332, 335 (Bankr. E.D.N.Y.1983); *Matter of Abercrombie,* 39 B.R. 178, 179 (Bankr.N.D.Ga.1984); *In re Clark,* 38 B.R. 683, 684–85 and N. 3 (Bankr.E.D.Pa.1984); *Matter of Willey,* 24 B.R. 369, 374–75 (Bankr.E.D.Mich. 1982); *Matter of Risser,* 22 B.R. 868, 870 (Bankr.S.D.Cal.1982); *Matter of Hackney,* 20 B.R. 158, 159 (Bankr.D.Idaho 1982); *In re Flick,* 14 B.R. 912, 918 (Bankr.E.D.Pa.1981); *Matter of Lewis,* 8 B.R. 132, 137 (Bankr.D.Idaho 1981).

Absent the showing of fraud, failure of a plan to comply with the requirements of the Bankruptcy Code as to confirmation such as found in § 1325, when there has been no timely objection to the plan, does not constitute grounds to set aside the order of confirmation. This important legal principle was discussed at some length by the court in *In re Szostek,* 886 F.2d 1405 (3rd Cir.1989). There the court stated as follows:

Under § 1327, a confirmation order is *res judicata* as to all issues decided or which could have been decided at the hearing on confirmation. On the

other hand is the language of § 1325(a) which provides that a court shall confirm a plan which meets the conditions listed in that section. The conflict resulted here when a confirmation order was entered for a plan which did not provide for the calculation of present value of the creditor's claim, a requirement of § 1325(a)(5)(B)(ii). Thus, we must determine whether, in the absence of fraud, the failure of a creditor to attend the confirmation hearing, object timely to the plan, or appeal the order of confirmation, regardless of the reason, precludes the creditor from obtaining full recovery of the present value of its claim when such was not provided for in the confirmed plan.

To understand the tension between the code sections, we must first look at one of the relevant portions of the Bankruptcy Code. We find that 11 U.S.C.A. § 1327(a) provides as follows:

Effect of confirmation

(a) The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted or has rejected the plan.

11 U.S.C.A. § 1327 (West 1979). One leading commentator has recently interpreted this section as follows:

it is quite clear that the binding effect of a chapter 13 plan extends to any issue actually litigated by the parties and any issue necessarily determined by the confirmation order, including whether the plan complies with sections 1322 and 1325 of the Bankruptcy Code. For example, a creditor may not after confirmation assert that the plan was not filed in good faith, ... that the creditor should have been paid interest; that the debtor is ineligible for chapter 13 relief; or that the plan is otherwise inconsistent with the Code in violation of Section 1322(b)(10) or section 1325(a)(1).

5 Collier on Bankruptcy, § 1327.01 (5th ed. 1988).

The finality of confirmed plans was discussed by the Supreme Court in *Stoll v. Gottlieb*, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938). At issue in *Stoll* was a corporate debtor's plan which included cancellation of a guaranty to pay a bond. Prior to confirmation, there had been no objections to the plan. After confirmation, however, the creditor filed an action in state court to recover on the guaranty. The Supreme Court held that the finality of the bankruptcy confirmation order barred the creditor from litigating its claim.

Several of our recent cases have followed this rational. For example, in *United States ex rel. I.R.S. v. Norton*, 717 F.2d 767 (3d Cir.1983), we held that the Internal Revenue Service (I.R.S.) could not retain overpayment of a debtor's taxes as security on the debt to the I.R.S. when the I.R.S. did not object to the debtor's plan, because, upon confirmation, the I.R.S. became bound by the plan's provisions. Similarly, in *In re Penn Central Transportation Company*, 771 F.2d 762 (3d Cir.1985), we held that a creditor who received notice of a railroad reorganization and failed to participate in the proceedings was barred from litigating an antitrust claim. We stated that

the purpose of bankruptcy law and the provisions for reorganization could not be realized if the discharge of debtors were not complete and absolute; that if courts should relax provisions of the law and facilitate the assertion of old claims against discharged and reorganized debtors, the policy of the law would be defeated; that creditors would not participate in reorganization if they could not feel that the plan was final, and that it would be unjust and unfair to those who had accepted and acted upon a reorganization plan if the court were thereafter to reopen the plan and change the conditions which constituted the basis of its earlier acceptance.

*In re Penn Central*, 771 F.2d at 767, citing *Duryee v. Erie R.R. Co.*, 175 F.2d

58, 61–63 (6th Cir.), *cert. denied,* 338 U.S. 861, 70 S.Ct. 103, 94 L.Ed. 527 (1949).

Other courts of appeals have upheld the binding effects of a bankruptcy confirmation order. A creditor was bound by a plan that released the third party guarantor in *Republic Supply Co. v. Shoaf,* 815 F.2d 1046 (5th Cir.1987). The court stated that, regardless of whether the plan provision to release the guarantor was inconsistent with the bankruptcy laws or within the authority of the bankruptcy court, it was nonetheless included in the plan. Since the plan was confirmed without objection, nor was an appeal taken, the plan was not reviewable on its merits. 815 F.2d at 1050.

A case with facts analogous to the case here is *Neeley v. Murchison,* 815 F.2d 345 (5th Cir.1987). In *Neeley,* the creditor filed his objection to dischargeability ten days after the time limitation period. The bankruptcy court held that when the creditor's attorney erroneously relied on both oral statements by the bankruptcy court's clerks as to time limitation and the blank space on a form received from the bankruptcy clerk as to the deadline to file objections, his reliance was misplaced because the bankruptcy rules plainly stated the time deadline. The bankruptcy court found the creditor's objection time-barred. The Court of Appeals for the Fifth Circuit affirmed. 815 F.2d at 347.

Similarly, in *Matter of Gregory,* 705 F.2d 1118 (9th Cir.1983), the Court of Appeals for the Ninth Circuit held that the failure to raise an objection at the confirmation hearing, or to appeal from the confirmation order, should preclude an attack on the plan or any provision therein as being illegal in a subsequent proceeding. The court of appeals noted that the creditor's treatment seemed "grossly unfair" because of a zero-payment plan provision where the debtor, a convicted embezzler, owed $17,000 to his employer. Nonetheless, the court concluded, if a creditor ignores the bankruptcy proceedings, he does so at his peril. 705 F.2d at 1123.

*Id.* 1408–1410. *See also, Goss v. Goss,* 722 F.2d 599 (10th Cir.1983) ("Consequences of a final unappealed judgment on the merits [are not] altered by the fact the judgment may have been wrong.", *quoting Federated Dept. Stores, Inc v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103 (1981); *In re Sanders,* 81 B.R. 496 (Bankr.W.D.Ark.1987) (confirmed plan *res judicata* so long as court is competent to preside over matters at issue, even erroneous determination as to extent of court's jurisdiction is *res judicata,* and not subject to collateral attack); *In re Emergency Beacon Corp.,* 84 B.R. 329 (S.D.N.Y.1988) (confirmation order not void even though erroneous; in order for order to be void court must have lacked subject matter or personal jurisdiction or must have acted without due process of law, *citing Swift and Co. v. United States,* 276 U.S. 311, 48 S.Ct. 311, 72 L.Ed. 587 (1928); *In re Blanton Smith Corp.,* 81 B.R. 440 (M.D.Tenn. 1987) (order confirming plan would not be set aside even if contained error of law where order was neither void nor a mistake, and there was no allegation of fraud).

The Bank has not timely appealed the confirmation order pursuant to Fed. R.Civ.P. 59 as made applicable by Bankr.R. 9023, nor has it moved to set aside the confirmation order pursuant to Fed.R.Civ.P. 60 as made applicable by Bankr.R. 9024. Neither has the Debtor.

The net effect is a final appealable confirmation order that has made erroneous findings relating to § 1325(a)(5). However, these erroneous findings cannot result in the Bank's lien being modified or voided when the Amended Plan itself upon which the confirmation order was based had no provision therein relating to the treatment of the Bank's lien or liens. Thus, the Bank's underlying lien is not modified or voided by the erroneous confirmation order. However, though erroneous it will discharge the Debtor's underlying *in personam* indebt-

edness to the Bank which was provided for in the Plan.

*Id.* 111 B.R. at 224–26.

The foregoing is equally applicable to an order confirming a chapter 11 plan. Section 1141(a) of title 11 provides as follows:

§ 1141. Effect of confirmation.

(a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in, the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

■ A confirmed plan has the effect of a judgment rendered by the District Court. *In re French Gardens Ltd.*, 58 B.R. 959, 962 (Bankr.S.D.Tex.1986), *citing, Stoll v. Gottlieb*, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938); *In re Emmer Brothers Company*, 52 B.R. 385, 390 (D.Minn.1985).

■ An order confirming a plan is a final appealable order. *Kham and Nates Shoes No. 2 v. First Bank of Whiting*, 908 F.2d 1351, 1354 (7th Cir.1990).

Thus, the Order of December 30, 1988 confirming the Debtor's Amended Plan was a final appealable order.

In *Central Illinois Co. v. Irving Trust Co.*, (*In re Pottasch Bros. Co., Inc.*), 79 F.2d 613, 101 A.L.R. 1182 (2nd Cir.1935), Judge Hand held that a bankruptcy referee had the "ancient and elementary power" to reconsider an order. In *Wayne United Gas Company v. Owens–Illinois Glass Company*, 300 U.S. 131, 57 S.Ct. 382, 81 L.Ed. 557 (1937), the Supreme Court held that the bankruptcy court has continuous powers to modify its own orders if no intervening rights are disturbed. *Accord, Federal Land Bank of Springfield v. Hansen*, 113 F.2d 82 (2nd Cir.1940).

However, the Seventh Circuit in the case of *Matter of Met–L–Wood Corp.*, 861 F.2d

1012 (7th Cir.1988), stated that the bankruptcy court's inherent powers to reconsider orders has been merged into the Bankruptcy Rules of Practice and Procedure and the Federal Rules of Civil Procedure. The *Met–L–Wood Corp.* Court stated as follows:

[L]et us now consider whether his [trustee's] motion under rule [F.R.Civ.P.] 60(b) to revoke the bankruptcy judge's approval of the sale was properly denied. There is a preliminary question. Long before there was a Rule 60(b), bankruptcy courts exercised what they conceived to be, and what in fact has traditionally been regarded as, an inherent judicial power to reconsider their judgments within a reasonable time, including judgments confirming sales. *See*, 4 B. *Collier on Bankruptcy*, par. 70.98[17], at pp. 1183–94 (14th ed. 1978). Now that there is a Rule 60(b), expressly applicable to bankruptcy as we have seen, the inherent power seems otiose; and although the cases continue to refer to it, they define it in terms of Rule 60(b). *See e.g., In re Chung King, Inc.*, 753 F.2d 547, 549–50 (7th Cir.1985). As a natural development from those cases, as well from the text of Bankruptcy Rule 9024, which applies Rule 60(b) to bankruptcy proceedings, we hold that confirmed sales— which are final judicial orders—can be set aside only under Rule 60(b). We conclude that the old inherent power to reconsider bankruptcy orders has been merged into the rule.

*Id.*, 861 F.2d at 1018. (parenthetical supplied for clarity).

Thus, the Bankruptcy Court no longer has an inherent power to reconsider its prior orders, rather its post-judgment reconsideration power is controlled by Bankr.R. 7052 applying Fed.R.Civ.P. 52, Bankr.R. 9023 applying Fed.R.Civ. 59, and Bankr.R. 9024 applying Fed.R.Civ.P. 60. *See, In re Leiter*, 109 B.R. 922 (Bankr. N.D.Ind.1990).

Motion to reconsider are hybrid motions under the Federal Rules of Civil Procedure. The Ninth Circuit Bankruptcy Appellate Panel noted in *In re Curry and Sorensen*,

*Inc.*, 57 B.R. 824, 14 CBC 2nd 606, 609 (BAP 9th Cir.1986):

> The federal rules do not contemplate motions for reconsideration. *Smith v. Hudson*, 600 F.2d 60, 62 (6th Cir.1979); *In re Morrison, supra*, 26 B.R. [57] at 60 [ (Bankr.N.D.Ohio 1982) ]. However, there is a policy of liberally construing appellate rules to carry out the desire of Congress to promote fairness in the administration of justice and a just determination of litigation. *Bordallo v. Reyes*, 763 F.2d 1098, 1102 (9th Cir.1985). Therefore, motions for reconsideration have traditionally been treated as motions to alter or amend under rule 59(e), Fed.R.Civ.P., if the motion draws into question the correctness of the trial court's decision. *See, In re Branding Iron Steak House, supra*, 536 F.2d at 301 [536 F.2d 299 (9th Cir.1976) ]; *Bestran Corp. v. Eagle Comtronics, Inc.*, 720 F.2d 1019 (9th Cir.1983); *In re 6 & 40 Inv. Group, Inc., supra*, 752 F.2d at 515–16 [ (752 F.2d 515) (10th Cir.1985) ].

The time to file a Motion to alter or amend a judgment or for a new trial is controlled by Fed.R.Civ.P. 59(b) and 59(e). Those subsections state:

> (b) *Time of Motion.* A motion for new trial shall be served no later than 10 days after entry of judgment.
>
> \* \* \* \* \* \*
>
> (e) *Motion to Alter or Amend a Judgment.* A Motion to alter or amend a judgment shall be served not later than 10 days after the entry of judgment.

Bankruptcy Rule 9023 applies Federal Rule of Civil Procedure 59 to all cases under the Bankruptcy Code. The Advisory Committee notes to B.R. 9023 states:

> Rule 59 F.R.Civ.P. regulates motions for a new trial and amendment of judgment. *Those motions must be served within 10 days of the entry of judgment.* No similar time limit is contained in Rule 3008

which governs reconsideration of claims. (Emphasis added).

A Motion for the Court to amend its findings or make additional findings is governed by Fed.R.Civ.P. 52 as made applicable by Bankr.R. 7052.[2] The time to file such a motion is set out at Fed.R.Civ.P. 52(b) which provides as follows:

> (b) **Amendment.** Upon motion of a party made not later than 10 days after entry of judgment the court may amend its findings or make additional findings and may amend the judgment accordingly.

The applicable method for time computation is set out in Bankr.R. 9006(a). This rule states:

> (a) **Computation.** In computing any period of time prescribed or allowed by these rules, by the local rules, by order of court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, in which event the period runs until the end of the next day which is not a Saturday, a Sunday, or a legal holiday. When the period of time prescribed or allowed is less than eight days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation. As used in this rule and in Rule 5001(c), "legal holiday" includes New Year's Day, Washington's Birthday, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans' Day, Thanksgiving Day, Christmas Day, and any other day appointed as a holiday by the President or the Congress of the United States, or by the state in which the bankruptcy court is held. (Amended effective, August 1, 1989, changing period from eleven days to eight days.)

This rule controls the determination of the timeliness of a Motion. *See, In re Fisher*, 65 B.R. 261 (Bankr.N.D.Ga.1986)

---

**2.** Pursuant to Bankr.R. 9014, Fed.R.Civ.P. 52 is also made applicable to contested matters pursuant to Bankr.R. 7052.

(Creditor filed notice of appeal 11 days after entry of order).

It should also be noted that Bankr.R. 9006(b)(2) expressly prohibits the Court from enlarging the time to take action under Bankr. 9023.

■ A Motion to Reconsider is a Motion to Alter, Amend or Vacate an Order, which must be served within ten (10) days from the date of entry of the Order. The Court lacks the power to extend the time for such a motion. *Bailey v. Sharp*, 782 F.2d 1366, *appeal after remand*, 811 F.2d 366 (7th Cir.1986); *In re the Matter of Embrey*, 56 B.R. 626, 627 (Bankr.W.D.Mo.1986).

Therefore, to be timely filed, a motion for reconsideration must be served within ten (10) days from the entry of the order and/or judgment. Bankruptcy Rule 9013 governs service. Pursuant to Bankr.R. 9006(e) service is complete on mailing.

Clearly, the Order of December 30, 1988 confirming the plan, which is a final appealable order, cannot be addressed by a Motion under Fed.R.Civ.P. 52 or Fed.R.Civ. 59, as made applicable by Bankr.R. 9023, as the ten (10) day period from date of entry has run.

No allegations of excusable neglect, etc., under Fed.R.Civ.P. 60(b), as made applicable by Bankr.R. 9024 has been made by FCS, and that rule is thus not applicable either. In addition, as the Seventh Circuit held in *Swam v. United States*, 327 F.2d 431 (7th Cir.1964), *cert. den.* 379 U.S. 852, 85 S.Ct. 98, 13 L.Ed.2d 55, Fed.R.Civ.P. 60(b)(1) does not apply to erroneous rulings of law. If an error of law has been allegedly made, an appeal should be taken or a timely motion pursuant to Fed.R.Civ.P. 59 should be filed. In addition, Fed.R.Civ.P. 60(b) provides that a motion based on Fed.R.Civ.P. 60(b)(1), (2) and (3) cannot be filed over one year after the judgment or order was entered, and more than one year has elapsed between the date of the entry of the Order confirming the Amended Plan and the Motion by FCS.

In addition, there is no assertion that there has been a mere clerical mistake arising from an oversight or omission that may be corrected pursuant to Fed.R.Civ.P. 60(a) as made applicable by Bankr.R. 9024, which may be done "at any time". It should also be noted that Fed.R.Civ.P. 60(a) does not apply to matters of substantive judgment. *Olle v. Henry & Wright Corp.*, 910 F.2d 357, 363–64 (6th Cir.1990). *See also, Bershad v. McDonough*, 469 F.2d 1333 (7th Cir.1972) (Rule 60(a) only applies to errors of transcription, copying, and calculations, and not to a fundamental failure of discovery or notification).

■ It should also be noted that Bankr.R. 9024 provides as follows:

**Rule 9024. Relief from Judgment or Order.**

*Rule 60 FR Civ P applies in cases under the Code except that* (1) a motion to reopen a case under the Code or for the reconsideration of an order allowing or disallowing a claim against the estate entered without a contest is not subject to the one year limitation prescribed in Rule 60(b), (2) a complaint to revoke a discharge in a chapter 7 liquidation case may be filed only within the time allowed by § 727(e) of the Code, and (3) a *complaint to revoke an order confirming a plan may be filed only within the time allowed by § 1144 or § 1330.* (Emphasis supplied).

Section 1144 of Title 11 provides:

On request of a party in interest *at any time before 180 days after the date of the entry of the order of confirmation,* and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud. An order under this section revoking an order of confirmation shall

(1) contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation; and

(2) revoke the discharge of the debtor.

11 U.S.C. § 1144. (Emphasis supplied). Collier's notes:

A proceeding to revoke confirmation of a chapter 11 plan is an adversary proceeding as defined in Rule 7001 of the Federal Rules of Bankruptcy Procedure. Accordingly, the proceeding to revoke

confirmation is commenced by the service and filing of complaint and many of the Federal Rules of Civil Procedure are made applicable. If there is a failure to oppose the complaint through the filing of an answer, the plaintiff may seek a default judgment pursuant to Bankruptcy Rule 7055 which incorporates by reference Rule 55 of the Federal Rules of Civil Procedure.

5 *Collier on Bankruptcy,* ¶ 1144.01, p. 1144–3 (L. King 15th Ed.). An order confirming a reorganization plan may only be revoked if the order was procured by fraud. *In re Longardner & Associates, Inc.,* 855 F.2d 455, 460 (7th Cir.1988) *cert. denied,* 489 U.S. 1015, 109 S.Ct. 1130, 103 L.Ed.2d 191; *In re A.J. Mackay Co.,* 50 B.R. 756, 758–59 & n.1 (D.Utah 1985); *In re Chipwich, Inc.,* 64 B.R. 670, 678 (Bankr. S.D.N.Y.1986). This showing must be one of actual fraud. *In re Hertz,* 38 B.R. 215, 220 (Bankr.S.D.N.Y.1984). This may include any deceit, artifice, trick, or design used to cheat another: something said or done or omitted with intent to perpetrate deception; fraud requires proof of bad faith, immorality, or intentional wrongdoing. *In re Kostoglou,* 73 B.R. 596, 598–601 (Bankr.N.D.Ohio 1987). A determination of the existence of fraud necessary for the revocation of an order of confirmation of a Chapter 11 Plan must be made on the specific facts of each case with a view to whether, in each case, the requisite fraudulent intent has been demonstrated. A request to revoke a confirmation order is untimely if filed more than 180 days after the entry of the order confirming the plan. *In re Cinderella Clothing Industries, Inc.,* 93 B.R. 373, 375–76 (Bankr.E.D.Pa. 1988); *In re Air One, Inc.,* 75 B.R. 1003, 1005 (Bankr.E.D.Mo.1987). The request to revoke an Order of Confirmation must be filed as an adversary proceeding pursuant to Bankr.R. 7001(5). *Id.* at 1004–05.

No adversary proceeding has been filed by FCS within 180 days of the confirmation order seeking to have said order revoked because it was procured by fraud.

Finally, no motion has been filed to modify the plan post confirmation pursuant to 11 U.S.C. § 1127(b).

■ Accordingly, inasmuch as 11 U.S.C. § 1144, 11 U.S.C. § 1127, Fed.R.Civ.P. 59, and Fed.R.Civ.P. 60 are not applicable, the Court must determine whether it can enter a final order based on FCS' motion to "interpret" the Amended Plan, which was confirmed by a final appealable order of this Court over one year prior to the filing of the motion. However, this does not mean that the Court does not have jurisdiction to rule on FCS' motion.

It was stated *In re Johns–Manville Corp.,* 97 B.R. 174 (Bankr.S.D.N.Y.1989) as follows:

To the extent provided for in a plan of reorganization, a bankruptcy court retains post-confirmation jurisdiction to determine certain disputes, especially those that arise under a plan. *See In re Terracor,* 86 B.R. 671, 676 (D.Utah 1988); *In re Johns–Manville Corp.,* 91 B.R. 225, 228 (Bankr.S.D.N.Y.1988) (Lifland, C.B.J.); *In re Tacoma Boatbuilding Co.,* 81 B.R. 248, 251 n. 1 (Bankr. S.D.N.Y.1987) (Lifland, C.B.J.); *In re Turner Bros., Inc.,* 66 B.R. 26, 27 (Bankr.E.D.Okla.1986); *In re Tri–L Corp.,* 65 B.R. 774, 778 (Bankr.D.Utah 1986); *In re Silver Mill Frozen Foods, Inc.,* 23 B.R. 179 (Bankr.W.D.Mich.1982). *See also,* 5 *Collier on Bankruptcy,* § 1142.01 at 1142–1–11422–6 (15th ed. 1979 & Supp.1988).

*Even without a specific retention provision in a plan, this Court has previously held that jurisdiction of the bankruptcy court continues post-confirmation as to fundamental questions of interpretation and administration of a plan. In re Johns–Manville Corp.,* 91 B.R. at 228. As articulated in that decision, "the question of interpretation of the administration of the plan belonged in the bankruptcy court." *Id.* *See also, In re Hermitage Bldg. Corp.,* 100 F.2d 597, 599 (7th Cir.1938); *Shores v. Hendy Realization Co.,* 133 F.2d 738 (9th Cir.1943).

Moreover, this Court in support of its retention of jurisdiction to enjoin an ac-

tion in an non-bankruptcy forum stated as follows:

> The court best equipped as well as the one properly entitled to resolve disputes of that kind was the court in which the proceeding had been conducted. As to fundamental questions of interpretation and administration such as these we think the jurisdiction of the bankruptcy court continues whether future consideration of them was expressly reserved or not.

*In re Johns–Manville Corp.*, 91 B.R. at 228. (*quoting Shores v. Hendy*, 133 F.2d at 741). *See also, In re Standard Gas & Electric Co.*, 139 F.2d 149, 152 (3rd Cir.1943); *Evans v. Dearborn Machinery Movers Co.*, 200 F.2d 125, 128 (6th Cir.1952). However, it is clear under these circumstances, that this Court did expressly and unambiguously retain jurisdiction.

In the same regard, it has been determined that *the bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders in aid of their proper execution. In re St. Louis Freight Lines, Inc.*, 45 B.R. 546, 551 (Bankr.E.D.Mich.1984), *In re Arctic Enters, Inc.*, 35 B.R. 978, 979 (Bankr. D.Minn.1983).

Furthermore, with respect to implementation of the plan, § 1142(b) of the Code allows the bankruptcy court to issue the orders necessary for consummation of a plan and provides:

> The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan.

Some Courts have relied on § 1142(b) to supply a basis for general post-confirmation jurisdiction. The Court in *In re Terracor*, 86 B.R. 671 (D.Utah 1988), for example, stated that "[t]he clear intent of Section 1142(b) is ... to assure that the terms and provisions of the con-

firmed Chapter 11 plan are carried out until the plan is completed and a final decree is entered closing the case." *Id.* at 676. *See also, In re Coral Air, Inc.*, 40 B.R. 979, 982 (D.V.I.1984).

Finally, the Court may also rely on § 105(a) of the Code which authorizes it to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" Title 11. Section 105(a) confers authority on the bankruptcy court to enjoin actions in other courts that interfere with the reorganization of the debtor, *In re Johns–Manville Corp.*, 68 B.R. [618] at 625. [Bankr. S.D.N.Y.1986]

In a prior decision in these cases construing § 105 it was observed: "indeed, bankruptcy courts frequently issue injunctions that limit recourse against the debtor, far beyond the date of confirmation." *In re Johns–Manville Corp.*, 68 B.R. at 625. There, it was held that the provisions of the Plan, the Injunction and the notice thereof, were constitutional and were proper and fair under the circumstances of these cases.

In a similar situation in these very bankruptcy cases, an injunction issued to enjoin an action brought in a non-bankruptcy forum which posed a threat to the jurisdiction of this Court, the propriety of the Confirmation Order, and the success of the reorganization. *In re Johns–Manville Corp.*, 91 B.R. 225 (Bankr. S.D.N.Y.1988). Relying on its post-confirmation jurisdiction to enforce its own decrees, to resolve disputes under the Plan, and pursuant to its retention of jurisdiction under the Plan, the non-bankruptcy action was enjoined. The exercise of this Court's continuing jurisdiction to enjoin non-bankruptcy suits that impair or violate the provisions of the Plan has become "law of the case." *See e.g., James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 572 F.2d 574, 577 (7th Cir. 1978); *Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir.), *cert. denied*, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964).

Thus, this Court has jurisdiction to consider and determine this matter pursuant to the various provisions of Article

X of the Plan, or by virtue of this Court's inherent jurisdiction to determine disputes under a plan, or pursuant to § 1142(b) or § 105(a), and in light of its prior decision on similar material facts.

*Id.* 97 B.R. at 180–81. (Emphasis supplied).

This Court concludes that the *Johns–Manville* Court correctly states the applicable law, and that this Court has the jurisdiction and power to enter an order construing or interpreting the terms and conditions of an order confirming a plan, if the plan is either ambiguous, and uncertain, or if the plan is inconsistent with the Order confirming it, and in addition, the Court may enter an order enforcing execution or implementing the plan, even though Fed. R.Civ.P. 59, and 60, and 11 U.S.C. § 1144 are not applicable, in that such an Order does not constitute a modification of the Confirmation Order or Plan, or challenge the validity or the correctness of the Confirmation Order, or the Plan which remains *res judicata* as to the parties thereto.

■■ If there is any conflict in the provisions of an order confirming plan, it is for the court to resolve that conflict if there has been no appeal from the order. *In re Moir Hotel Co.*, 186 F.2d 377 (7th Cir.1950).

The Eleventh Circuit in *In re Ranch House of Orange–Brevard, Inc.*, 773 F.2d 1166, 1168 (11th Cir.1985), held that the bankruptcy judge who has presided over the case from its inception is in the best position to clarify any apparent inconsistencies in its rulings. However, the Bankruptcy Code pursuant to 11 U.S.C. § 1142 limits the authority of the Bankruptcy Court following confirmation of a plan to motions of implementation or execution of the confirmed plan. *In re Goodman*, 809 F.2d 228, 232 (4th Cir.1987). *See also, In re Samoset Associates*, 654 F.2d 247, 253 (1st Cir.1981); *In re Century Inv. Fund VIII Ltd. Part.*, 114 B.R. 1003, 1008–09 (Bankr. E.D.Wis.1990); *In re Greenley Energy Holdings of Pennsylvania, Inc.*, 110 B.R. 173, 180–84 (Bankr.E.D.Pa.1990); *In re Service Decorating Co.*, 105 B.R. 859, 861 (N.D.Ill.1989); *In re St. Louis Freight Lines*, 45 B.R. 546, 551 (Bankr.E.D.Mich. 1984).

It has been stated generally as follows:

The mere interpretation of a judgment involves no challenge of its validity, or an attack thereon. Accordingly, a rule prohibiting the correction of judicial error in a judgment, by an amendment thereof by the court which made it, does not prevent the court from defining the language used, where such language is of dubious meaning or open to diverse interpretation. Similarly, the general rule precluding a collateral attack upon a judgment does not prevent the interpretation of a judgment which is incomplete or ambiguous upon its face, or an explanation of the judgment by parol evidence. If, on the other hand, the judgment is not ambiguous or uncertain, the parol evidence rule applies, and the written judgment should be accepted at its face value and without speculating as to the reasoning employed in reaching the particular result.

46 Am.Jur.2d, *Judgments*, § 72 (footnotes omitted).

That same treatise states as follows:

As a general rule, judgments are to be construed like other written instruments. The determinative factor is the intention of the court, as gathered, not from an isolated part thereof, but from all parts of the judgment itself. Hence, in construing a judgment, it should be examined and considered in its entirety. Such construction should be given to a judgment as will give force and effect to every word of it, if possible, and make it as a whole consistent and reasonable. In applying this rule, effect must be given to that which is unavoidably and necessarily implied in a judgment, as well as to that which is expressed in the most appropriate language. Sometimes, it is declared that the interpretation or construction of a judgment must be characterized by justice and fairness.

46 Am.Jur.2d, *Judgments*, § 73 (footnotes omitted).

The Court in *Security Mutual Casualty Company v. Century Casualty Company,*

621 F.2d 1062 (10th Cir.1980) stated as follows:

> If there is any ambiguity or obscurity or if the judgment fails to express the rulings in the case with clarity or accuracy, reference may be had to the findings and the entire record for the purpose of determining what was decided. *See, Moore v. Harjo,* 144 F.2d 318, 321 (10th Cir.) [1944].

■ An ambiguous judgment should be construed to give effect to all parts of a judgment. *Brunswick Corp. v. Chrysler Corp.,* 408 F.2d 335 (7th Cir.1969).

In construing an ambiguous or uncertain judgment it has been stated generally as follows:

> A judgment which is ambiguous and uncertain may be read in connection with the entire record and construed accordingly. Where, on the whole record, the scope of the judgment can be ascertained, it will be construed in accordance with that record, as influenced by the applicable statutes and rules of procedure, and by the character and object of the proceeding culminating in the judgment. Under this rule, it is proper to consider the pleadings, and the issues raised thereby, as well as the findings of the court or verdict of the jury. The application of these rules results in a construction reached in the light of the situation of the court, what was before it, and the accompanying circumstances.
>
> If, however, a judgment is not ambiguous and leaves nothing for interpretation, there is no need to refer to the pleadings or other parts of the record. It is clear that if a finding is inconsistent with the judgment proper or decretal party of the judgment, the latter must control.

46 Am.Jr.2d, *Judgments,* § 75 (footnotes omitted).

■ It is the responsibility of the court to construe a judgment so as to give effect to the intention of the court and not of the parties. *United States of America v. 60.22 Acres of Land,* 638 F.2d 1176 (9th Cir.1980).

It has also been stated that the purpose of construing the ambiguous provisions in a judgment is to give effect to what is already latently in the judgment. *Ridley v. Phillips Petroleum Company,* 427 F.2d 19 (10th Cir.1970).

The Supreme Court in *Mayor and Alderman of City of Vicksburg v. Henson,* 231 U.S. 259, 34 S.Ct. 95, 58 L.Ed. 209 (1913) held that, a decree is to be construed with reference to the issues to be decided. "Every decree in a suit in equity must be considered in connection with the pleadings, and if its language is broader than is required, it will be limited by construction so that its effect shall be such, and such only, as is needed for the purposes of the case that has been made and the issues that have been decided." *Id., quoting, Graham v. Railroad Company,* 70 U.S. (3 Wall) 704, 18 L.Ed. 247 (1865).

As to *Consent* decrees and orders however, it has been stated as follows in the case of *Eaton v. Courtaulds of North America, Inc.,* 578 F.2d 87 (5th Cir.1978):

> The Supreme Court has said that "since consent decrees and orders have many of the attributes of ordinary contracts, they should be construed basically as contracts," *United States v. ITT Continental Baking [Banking] Co.,* 420 U.S. 223, 236, 95 S.Ct. 926, 934, 43 L.Ed.2d 148 (1975), and this court has observed that the contractual aspects of a consent decree exist "chiefly ... in regard to disputes concerning what the parties actually consented to as reflected by the judgment in question." *United States v. Kellum,* 523 F.2d 1284, 1287 (5th Cir. 1975). The present issue thus should clearly be treated as a matter of contractual interpretation. It has been frequently stated, however, that the interpretation of the written language of a contract is a matter of law and is reviewable as such. *See e.g., First National Bank of Miami v. Insurance Co. of North America,* 495 F.2d 519 (5th Cir. 1974); C. Wright & A. Miller, Federal Practice and Procedure: Civil, @2558.

\* \* \* \* \* \*

If possible, we are required to analyze a contract's meaning by its language

without resort to extrinsic considerations. This is because the language of an agreement, unless ambiguous, represents the parties' intention. *Kimbell [Foods, Inc. v. Republic National Bank], supra* [557 F.2d 491] at 496. [5th Cir.1977] Of settlement agreements in particular, the Supreme Court has said that:

[The] agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.

*United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). Where ambiguities exist in the language of a consent decree, the court may turn to other "aids to construction," such as other documents to which the consent decree refers, as well as legal materials setting the context for the use of particular terms. *ITT Continental Banking, supra,* 420 U.S. at 238–43, 95 S.Ct. 926 [at 935–37].

The Court in *United States of America v. Motor Vehicle Manufacturer's Association of United States, Inc.,* 643 F.2d 644 (9th Cir.1981), stated as follows regarding the construction of a consent decree:

A consent judgment or decree has the attributes both of a contract and a judicial act. *See United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236, n. 10, 95 S.Ct. 926, 934, 43 L.Ed.2d 148 (1975). To the extent that such a judgment is a contract, an appropriate starting place in construing its meaning and

effect are the words of the judgment itself.

\* \* \* \* \* \*

The expectations of the parties must be discerned. While the district court is bound to construe the judgment by the meaning to be found within its "four corners," *United States v. Armour & Co., supra,* 402 U.S. at 682, 91 S.Ct. at 1757, the court may also consider the surrounding circumstances at formation as aids in construing the judgment. *Kittitas Reclamation District v. Sunnyside Valley Irrigation District,* 626 F.2d 95, 98 (9th Cir.1980), *cert. denied,* [449] U.S. [1079], 101 S.Ct. 861, 66 L.Ed.2d 802 (1981).

The court in *In re L & V Realty Corp.,* 76 B.R. 35 (Bankr.E.D.N.Y.1987) stated as follows:

In many respects a plan is in the nature of a contract. This was well put by Bankruptcy Judge Babbit in *In the Matter of United Merchants and Manufacturers, Inc.,* 24 C.B.C. 220, 226–227 (Bankr.S.D.N.Y.1981):

At its simplest, a plan is an offer of promises made by a debtor and accepted by the creditors following serious and frequently protracted negotiations. In many of its most vital aspects, a plan is a kind of contract involving, as it does, matters of offer, acceptance, performance and the like. Accordingly, disputed provisions should be interpreted in light of general contract principles ... This court hopefully will be pardoned if it borrows the historic meter of Chief Justice Marshall, albeit in considerably less heroic circumstances, that "it is a contract we are expounding."

It follows, therefore, that this exercise must begin with the language used in the plan, ... mindful as the Court is of Mr. Justice Frankfurter's observation relevant to construction of statutes, but relevant here also that a problem of contract interpretation seriously bothers courts "only where there is a contest between probabilities of meaning." If the language is found to be

clear and unambiguous, thus negating a contest "between probabilities of meaning," that language will convey the intention. (Citations omitted).

*Id.* 76 B.R. at 37. *See also, In re RBS Industries, Inc.,* 115 B.R. 417, 418 & n.1 (Bankr.D.Conn.1990); *In re RBS Industries, Inc.,* 115 B.R. 417, 421 & n.3 (Bankr. D.Conn.1990); *In re St. Louis Freight Lines, Inc.,* 45 B.R. 546, 552 (Bankr. E.D.Mich.1984) (citing cases).

In *L & V Realty,* the Debtor's argument that it misunderstood the terms of the plan was rejected by the Court in light of the clear language therein, and the court held that parol evidence was not admissible to vary the terms of the plan. The Court also noted that the Debtor was represented by able counsel when the plan was drafted, submitted to the court, and when it was confirmed, and a unilateral mistake could not form the basis for changing the terms of the plan when that mistake arises out of ones' own neglect, absent fraud. *Id.* 76 B.R. at 37–38.

The Order confirming the Amended Plan was pursuant to 11 U.S.C. § 1129(a), and in particular § 1129(a)(7)(A)(i), which provides that with respect to each impaired class of claims each holder of a claim of such class has accepted the plan and § 1129(a)(8)(A) which provides that with respect to each class of claims such class has accepted the plan.

The compilation of ballots filed on December 12, 1988, shows at Class Nine (unsecured creditors, including undersecured creditors) FCS voted its ballot affirmatively for the Amended Plan as an unsecured creditor in the sum of $81,057.67 pursuant to an immaterial modification.

The Amended First Material Modification was filed by the Debtor and FCS was filed on December 27, 1988. Clause B of that Modification expressly provides as follows:

(B) *FCB's Unsecured Claim.* By agreement, FCB shall be deemed to have an unsecured claim herein in the amount of $81,057.67, which unsecured claim shall be treated on an equal basis with all other unsecured creditors under the Amended Plan as a Class 9 claim.

The Agreed Immaterial Modification does not otherwise address the treatment of FCS' unsecured claim by the Amended Plan, i.e. whether the Debtor was obligated to pay FCS' unsecured claim in full in any event, or whether the Debtor was only obligated to pay an annual dividend if there were net profits available to do so.

On December 27, 1990 FCS also filed a motion withdrawing its objection to the Debtor's First Amended Plan based upon the Agreed Immaterial Modification.

Thus, the Order confirming the Amended Plan was not pursuant to the "cram down" provision found in 11 U.S.C. § 1129(b) wherein a plan can only be confirmed if all of the applicable requirements of § 1129(a) are met, other than paragraph (8), (such class has accepted the plan, or such class is not impaired by the plan), if the plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims that is impaired under, and has not accepted the plan.

The Court concludes, that the Order confirming the Debtor's Amended Plan pursuant to 11 U.S.C. § 1129(a) is more analogous to a contract between the Debtor and FCS, or a consent decree between the Debtors and FCS based upon the proposed Amended Plan by the Debtors, and the acceptance thereof by FCS, based upon the Agreed Immaterial Modification entered into between them. Thus, principles of contract construction and the parol evidence rule are applicable in construing the Order confirming the Amended Plan and/or the amended Plan.[3]

---

**3.** State law controls as to the construction of an ordinary contract. *Transcontinental & Wester Air, Inc. v. Koppal,* 345 U.S. 653, 73 S.Ct. 906, 97 L.Ed. 1325 (1953).

    The Indiana Courts have held that where there is no ambiguity found in a contract, its construction is a matter of law for the Court.

*Piskorowski v. Shell Oil Company,* 403 N.E.2d 838 (Ind.App.1980); *Wilson v. Kauffman,* 156 Ind.App. 307, 296 N.E.2d 432, 437 (1973).

    The Court in *Piskorowski, supra,* went on to say that a contract is ambiguous if reasonable men could find its terms susceptible to more than one interpretation, *citing, Tastee–Freez*

In an attempt to properly construe the Order confirming the Amended Plan and/or the Amended Plan as confirmed, the Court has searched the record as to the various matters and proceedings leading up to the Order ultimately confirming the Amended Plan which are set out below.

On June 9, 1988, the Court approved the debtors' original disclosure statement filed on May 4, 1988. The original plan filed with the aforementioned disclosure statement on May 4, 1988 included the following description of the treatment to be provided for unsecured creditors, which description is almost identical to that contained in the disclosure statement:

6.7 All unsecured claims along with the deficiencies of the secured creditors, shall be approximately Two Hundred

*Leasing Corp. v. Milwid,* 173 Ind.App. 675, 365 N.E.2d 1388, 1390 (1977), and *Myers v. Maris,* 164 Ind.App. 34, 326 N.E.2d 577, 581 (1975). 403 N.E.2d at 844. The test as to ambiguity has also been said to be whether reasonably intelligent persons could reach different conclusions as to the meaning of an instrument. *Shahan v. Brinegar,* 181 Ind.App. 39, 390 N.E.2d 1036 (1st Dist.Ind.App.1979).

The *Piskorowski* court further held that if the intention of the parties can be gleaned from their written expression of it however, that intention must be effectuated by the court for that is the primary overriding purpose of contract law to ascertain and give effect to the intentions of parties, *citing, Walb Construction Company v. Chipman,* 202 Ind. 434, 175 N.E. 132, 134 (1931), and *Fort Wayne Bank Bldg. Inc. v. Bank Building and Equipment Corp.,* 160 Ind.App. 26, 309 N.E.2d 464, 467 (3rd Dist.Ind.App.1974). 403 N.E.2d at 844.

Parol or extrinsic evidence is inadmissible to expand, vary, or explain an instrument unless there is a showing of fraud, mistake, ambiguity, illegality, duress, or undue influence. *Orme v. Estate of Kruwell,* 453 N.E.2d 355 (4th Dist.Ind. App.1983); *Stech v. Panel Mart, Inc.,* 434 N.E.2d 97 (3rd Dist.Ind.App.1982); *Hauck v. Second National Bank of Richmond,* 153 Ind.App. 245, 286 N.E.2d 852 (2nd Dist.Ind.App.1972).

If a written instrument appears to be complete on its face and executed, there is a conclusive presumption that it is the ultimate intent of the maker, and its terms ad conditions may not be varied or changed by parol or extrinsic evidence and only fraud, mistake, and like matters going to the validity of execution may be considered if put in issue. *Lewis v. Burke,* 248 Ind. 297, 226 N.E.2d 332 (1967).

In determining the meaning of contractual terms, the Court should read all of the contract's provisions together to harmonize words and

Thirty-seven Thousand Four Hundred Sixty-six Dollars and Twenty-one Cents ($237,466.21), as follows:

| | |
|---|---|
| Federal Land Bank | $126,133.65 |
| 1st National Bank of Monterey | 37,025.00 |
| J.I. Case | 9,000.00 |
| John Deere | 16,949.91 |
| Buckeye Ag–Center | 1,283.96 |
| Carl T. Doty | 17,829.90 |
| Jerry Eckert | 2,162.50 |
| Garst Seed Company | 531.00 |
| Knox Implement | 5,410.34 |
| Michael McNeal | 300.00 |
| Pulaski County Farm Bureau | 4,108.00 |
| Steiner Financial Corporation | 13,889.00 |
| Winclair Petroleum | 2,225.97 |
| TOTAL | $237,466.21 |

*The Debtors purpose to pay them a dividend of approximately* One Hundred Thirty-six Thousand Five Hundred Twenty-seven Dollars and Seventy-six Cents *($136,527.76) (which is approxi-*

phrases used, and to give effect to the parties' intentions as established at the time they entered into the agreement. *Washington Nat. Corp. v. Sears, Roebuck & Co.,* 474 N.E.2d 116 (1st Dist.Ind.App.1985).

It is a cardinal rule of construction of legal instruments that an instrument will be construed strictly against its author. *Chrysler Corp. v. Hanover Ins. Co.,* 350 F.2d 652 (7th Cir.1965), *cert. den.* 383 U.S. 906, 86 S.Ct. 890, 15 L.Ed.2d 664. It has been held that this rule of construction comes into play only when all other rules of construction fail. *Indiana—Kentucky Elec. Corp. v. Green,* 476 N.E.2d 141 (1st Dist.Ind.App. 1985).

If a contract is prepared or drafted by an attorney it will be construed *strictly* against the party who prepared or drafted it. *Mandle v. Owens,* 164 Ind.App. 607, 330 N.E.2d 362 (1st Dist.Ind.App.1975) *trans. den.* 265 Ind. 252, 353 N.E.2d 465; *Lacy v. White,* 153 Ind.App. 504, 288 N.E.2d 178 (1st Dist.Ind.App.1972).

In determining the intention of the parties to a contract, the Court may consider the circumstances which existed when the contract was made; it may also consider the nature of the contract, its subject matter and the apparent purpose of making the contract. *American Fletcher Mortgage Co. v. Cousins Mortg. and Equity Investments,* 623 F.2d 1228 (7th Cir.1980).

It should also be noted that it is an accepted rule of construction, that a special clause in a contract fitting special circumstances must prevail over a general clause applicable generally to other situations. *Fox Realty Co. v. Montgomery Ward & Co.,* 124 F.2d 710 (7th Cir.1941). And, it also is held that words of a particular meaning will control more general terms when they cannot stand together. *Fineberg v. Clark,* 137 Ind.App. 528, 209 N.E.2d 528 (Ind.App. 1965), *rehrg. den.* 137 Ind.App. 528, 210 N.E.2d 260 (Ind.App.1965).

*mately Fifty-seven point four percent 57.4%), which will be paid in five (5) annual installments over eleven percent (11%) per year,* as more specifically set forth in the cash flow charts attached to the Disclosure Statement as "Exhibit C" and "Exhibit D".

6.8 The above treatment will constitute payment in full of all of said claims.

These payments will be made on or before the 10th day of February of each year hereafter. They will be paid after payment of all secured and priority claims as set forth hereinabove.

The treatment provided above will be payment in full of all claims. A projected cash flow and crop plan for the 1988 crop year, and the 1989 through 1992 crop years are attached hereto and made a part hereof as "Exhibit C" and "Exhibit D," respectively. (Emphasis supplied).

On July 15, 1988, the First National Bank of Monterey filed its "Motion in Objection to Plan filed by Class IV Secured Creditor, First National Bank of Monterey." This objection concerns the values placed upon specific parcels of real estate by the debtor for the purpose of calculating the First National Bank's secured claim.

The Federal Land Bank of Louisville objected to the debtors' plan of reorganization on July 14, 1988, on the following grounds:

3. FLB objects to confirmation of Debtors' Plan of Reorganization for the reason that the same is in violation of § 1129(a)(7)(ii), as FLB will receive or retain under the Plan less than the amount FLB would receive pursuant to a Chapter 7 liquidation for the reason that the Plan fails to provide for treatment of the FLB stock in the sum of $15,000.00, has inadequate valuation for the real estate, proposes inadequate interest rate and an unreasonable length of term for repayment.

4. FLB further objects to the confirmation of Debtors Plan of Reorganization for the same fails to meet the requirements of § 1129(a)(8).

5. FLB further objects to the confirmation of Debtors' Plan of Reorganiza-

tion for the reason that the financial information contained in the Disclosure Statement together with Debtors' Monthly Operating Reports and historical financial information previously furnished discloses that Debtors' Plan is not feasible and that it would likely be followed by a liquidation or need for further financial reorganization.

6. FLB further objects to Debtors' Plan of Reorganization for the reason that the same fails to comply with § 1129(b)(2)(A)(II).

7. *FLB objects to confirmation of Debtors' Plan of Reorganization for the further reason that the same violates the Rule of Absolute Priority as to the treatment of that portion of FLB's claim that is unsecured, contrary to § 1129(B)(ii).* (Emphasis supplied).

Section 1129(b)(2)(A)(ii) referred to in the FCS objection relates to the fair and equitable treatment of FCS' secured claim which is not in issue here. However, § 1129(b)(2)(B)(ii) referred to in the FCS objection relates to absolute priority rule, which requires that all unsecured creditors, such as FCS as an undersecured creditor on its bifurcated unsecured claim, be paid in full before the Debtor be allowed to retain any interest in the property of the estate.

As noted above the original plan filed May 4, 1988, to which FCS objected based on the absolute priority rule, at Clause 6.7 provided for a dividend to unsecured creditors of *57.4%.*

After the objection by FCS to the original plan, the Amended Plan filed August 19, 1988 at Clause 6.9 provided for a total dividend of *111%* to unsecured creditors. Thus, by the Amendment, it appears the Debtors were attempting to address FCS' original objection to the Debtors' original plan based on § 1129(b)(2)(B)(ii) by increasing the proposed dividend from 57.4% to 100%.

John Deere filed its objection to the Debtors' plan on July 14, 1988. This objection only went to the value of its security and the treatment of its lien by the plan,

and not to the treatment of unsecured creditors.

J.I. Case Credit Corporation filed its objection to the Debtors' Plan of Reorganization on July 11, 1988. This objection only went to the value of the property in which John Deere claimed a security interest, and the treatment of its secured claim, and not to the treatment of unsecured creditors.

To summarize, only the objections of FCS to the original plan was directed to the treatment of the unsecured claims under the plan of reorganization in terms of the amount of the dividend to be paid, although one reason for the failure of the plan to be confirmed was the veto of the plan by the undersecured creditors.

After a hearing on the confirmation of the debtors Chapter 11 Plan of Reorganization on July 19, 1988, the court by Order dated July 20, 1988, denied confirmation thereof because the debtor did not have the requisite acceptances. The court's order of July 20, 1988, gave the debtor thirty (30) days to file a first amended plan. The debtors' filed their Amended Plan of Reorganization and Disclosure statement on August 19, 1988.

On November 2, 1988 the Court approved the Debtors' Amended Disclosure Statement, filed with this court on August 19, 1988, and fixed the time for filing objections to the plan. The Amended Disclosure Statement provided for the description of the payment of unsecured claims as set out at page 574, *supra.*

The First of America Bank–Rensselear filed an objection to the confirmation of the debtors' Amended Plan on October 28, 1988. This objection only went to the value of the property secured by First of America's and the amount due to it, and did not touch on the treatment of unsecured claims.

On December 2, 1988, Steiner Financial Corporation filed its "Objections to the Plan of Reorganization." This objection did address Section 6.9 of the Amended Plan dealing with unsecured creditors. However, it did not address treatment of its unsecured claim, but rather the amount of Steiner's unsecured claim.

This objection stated as follows:

2. Pursuant to Section 6.9 of the Amended Plan of Reorganization, unsecured creditors, along with the deficiencies of secured creditors, shall be paid approximately $166,000.00 in five (5) annual installments beginning thirty (30) days after confirmation, or February 10, 1989, whichever occurs last.

3. The Debtors have listed Steiner Financial Corporation as an unsecured creditor in the amount of $13,889.00. While the Creditor has no objection to the amount of the proposed dividend, Steiner Financial Corporation has been improperly listed in the Amended Plan of Reorganization as to the amount of its unsecured claim. On May 11, 1987, Steiner Financial Corporation filed two (2) Proofs of Claim indicating that its unsecured deficiency was $65,459.61. No objection has been filed to the Proof of Claim and thus, the unsecured deficiency of Steiner Financial Corporation is in the amount of $65,459.61.

4. The Debtors' Amended Plan of Reorganization should be modified to reflect that Steiner Financial Corporation's unsecured deficiency is $65,459.61, as opposed to the figure listed in the Amended Plan of Reorganization.

FCS filed its objection to the Debtors' Amended Plan on December 1, 1988. The objection stated in relevant part as follows:

1. That FCB is a secured creditor of Debtors by virtue of a first mortgage on approximately 597 acres and further secured by FCB stock with a value of $15,000.00.

2. That accordingly, FCB has a secured claim in the amount of $332,500.00 and an unsecured claim in the amount of $96,057.67.

3. FCB objects to confirmation of Debtors' Amended Plan of Reorganization for the reason that Debtors propose an inadequate interest rate and an unreasonable length of term for repayment of the secured claim and for the further reason that the proposed treatment of

the FCB stock will lead to an undercapitalization of FCB.

4. FCB further objects to the confirmation of Debtors' Amended Plan of Reorganization for the same fails to meet the requirement of § 1129(a)(8).

5. FCB further objects to the confirmation of Debtors' Amended Plan of Reorganization for the reason that the financial information contained in the Disclosure Statement together with Debtors' Monthly Operating Reports and historical financial information previously furnished discloses that Debtors' Amended Plan is not feasible and that it would likely be followed by a liquidation or need for further financial reorganization.

6. FCB further objects to Debtors' Plan of Reorganization for the reason that the same fails to comply with § 1129(b)(2)(A)(II).

7. *FCB further objects to confirmation of Debtors' Amended Plan of Reorganization for the reason that the same violated the Rule of Absolute Priority as to the treatment of that portion of FCB's claim that is unsecured, contract (sic) to § 1129(B)(ii).* (Emphasis supplied).

Again, it is noted that pursuant to paragraph 7 of its objection to the Debtors' First Amended Plan, as it did in its previous objection to the Debtors' original Plan, FCS asserted the "absolute priority" rule as found in § 1129(b)(2)(B)(ii), i.e. FCS asserted that it should be paid in full as to its unsecured claim, or the Debtors should retain no interest in the property of the Debtors' estate.

Both objections by FCS on this point were properly taken, and were clear and unequivocal, i.e. FCS wanted to be paid in full as to its unsecured claim, and if was not, the Debtors should not be permitted to retain any interest in the property of the Debtors' estate, as it had a right to do. *See, Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 967, 99 L.Ed.2d 169 (1988); *Kham & Nates Shoes No. 2 v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir.1990); *Matter of Stegall*, 865 F.2d 140 (7th Cir.1989); *In re Potter Material Service, Inc.*, 781 F.2d 99 (7th Cir. 1986).

The "Stipulation of Immaterial Modification of Debtors' Amended Plan of Reorganization," dated November 23, 1988 and filed December 2, 1988, with John Deere Company dealt with John Deere's claim as a fully secured claim in the amount of Forty-eight Thousand Four Hundred Forty-nine Dollars and Ninety-one Cents ($48,449.91), and did not address treatment of unsecured creditors.

On or about November 30, 1988, and filed December 12, 1988, the debtors and the First of America Bank agreed to an "Immaterial Modification of Plan Regarding First of America Bank—Rensselear" which adjusted the treatment of the payment of First of America Bank's secured claim, and did not address the treatment of unsecured claims.

It is clear to this court that the order confirming the Debtors' Amended Plan at paragraph three provides for the payment to unsecured creditors, including FCS in the sum of $81,057.67, from the "net profits" of the debtors' farming operations, net profits to be determined after first deducting priority claims, secured claims, operations expenses, to be divided pro rata. It is also clear that the Amended Plan that was confirmed by that Order provided as payment to unsecured creditors a total dividend of 111% out of net profits over a five year period. The Order confirming the Amended Plan is not inconsistent with the Amended Plan itself.

The Court concludes that the language and terminology employed in the Order confirming the Amended Plan, and in the Amended Plan as confirmed, is certain and unambiguous as a matter of law relating to the amount or extent of the dividend to be paid to unsecured creditors, including FCS, i.e. a pro rata dividend was to be paid annually at the percentages set out in Exhibit "C" and "D" to Amended Disclosure Statement, and incorporated into the Amended Plan, and thus parol or extrinsic evidence is not admissible to vary, modify, contradict, or alter the terms and condi-

tions of the Order confirming the Amended Plan or the Amended Plan as confirmed.

The Court also concludes that the language and terminology employed in the Order confirming the Amended Plan, and the Amended Plan as confirmed, setting out the methodology to be employed in computing the dividend to be paid to unsecured creditors on an annual basis, including FCS, is certain and unambiguous as a matter of law, i.e. the dividend is to be paid out of "net profits" after deducting the payment of priority claims, secured claims, operating expenses, and living expenses, and that parol or extrinsic evidence is not admissible to vary, modify, contradict, or alter the terms and conditions of the Order confirming the Amended Plan or the Amended Plan as confirmed.

The terms "net profits", "priority claims", "secured claims", "operating expenses", and "living expenses" are not defined in the Order confirming the Plan, or in the Amended Plan, and although these terms are to some extent self-explanatory in a generic sense, it is clear to the Court as to exactly what specific types of claims and expenses are to be considered in computing "net income", and exactly what comprises "net income", by reference to the detailed itemization thereof in Exhibits "C" and "D" to the original and Amended Disclosure Statements which is certain and unambiguous. Accordingly, parol or extrinsic evidence will not be admissible to vary, modify, contradict or alter those terms in determining what is net income.

The Court is faced with an Amended Plan which at Clause 6.9 states unequivocally, that the "debtors propose to pay them [unsecured creditors] a dividend of approximately ... $166,642.32, which *will* be paid in five annual installments ... as more specifically set forth in the cash flows attached hereto as Exhibits 'C and D'." (Emphasis supplied). Exhibit "C" provides without condition for an "unsecured distribution percentage—1988" of 13%, while Exhibit "D" provide without conditions for an "unsecured distribution percentage" of 24.5% each year for the years 1989 through

1992, and a "total percentage over 5-year plan" of 111%.

FCS accepted this provision of the Amended Plan when the Debtor and FCS filed their Amended First Immaterial Modification on December 27, 1988. (*See*, Clause B), and withdrew their objection to the First Amended Plan in lieu of filing a ballot accepting the Amended Plan. Accordingly, FCS accepted an Amended Plan that asserted, without reservation, or conditions, that the Debtor "will" pay $166,-642.32 on allowed unsecured claims over five years in annual installments. It is true, that the annual dividend is to be paid out of "net profits" after the payment of administrative and secured claims. However, there is no indication in Clause 6.9 that the dividend was paid *only* on the condition that there were net profits available to do so. The Debtors interpretation of the Amended Plan has the practical effect of reducing what was represented to be a 111% plan for unsecured creditors down to potentially a 0% plan if expenses exceed income during each of the five years of the Amended Plan. The Court concludes that this was not the understanding of the parties.

The Order confirming the Amended Plan provides that "Said plan, as modified, should be and is hereby confirmed, ..." Thus, the Order confirming the Amended Plan expressly states that the Amended Plan, as modified, was approved by the Court, and does not indicate that it was intended to in any way alter and modify the terms and conditions of the Amended Plan, including, but not limited to, Clause 6.9 relating to unsecured creditors.

Clause 3 of the Order confirming the Amended Plan, as noted previously, states as follows:

3. That the revised amount of claims due to the unsecured creditors as set forth above are hereby approved, with said unsecured creditors to receive annually for five (5) years all of the net profits (after priority claims, secured claims, operating expenses and living expenses) to be divided pro

rate among the creditors pursuant to the above claim amounts.

However, the Court does not deem the Clause 3 of the Order confirming the Amended Plan as being in any way inconsistent with or directly contradicting the provisions of Clause 6.9 of the Amended Plan, so as to be patently ambiguous, or inconsistent with the Amended Plan. Clause 3 of the Order can be read in harmony with Clause 6.9 of the Amended Plan, and the specific terms of the Amended Plan itself should control over any more general language in the Order confirming the Amended Plan. The Court concludes that Clause 6.9 of the Amended Plan is incorporated by reference into the Order confirming the Plan, and forms an integral part of the Confirmation Order.

The dividend is to be paid pro rata to unsecured creditors out of "net profits" after the payment of administrative and secured claims in both the Order and the Amended Plan. Obviously, all unsecured creditors holding allowed claims would participate pro rata as the Plan had no provisions for per capita payments, nor did the Amended Plan provide for more than one class of unsecured claims where, for instance, smaller claims were treated differently for administrative convenience as authorized by 11 U.S.C. § 1122(b). Thus, because all unsecured claims were in one class they would naturally be paid on a pro rata basis. That is, they would be paid a dividend proportionately according to the extent of the Debtors' liabilities to each unsecured creditor. To pay pro rata does not necessarily mean that payment is not to be made in full.

Contrary to the Debtors' position, the Court can just as easily construe the Amended Plan relating to "net profits" to mean that the Debtors have unconditionally agreed to pay 111% of all allowed secured claims over five years out of *"all* of the net profits" of the Debtor, i.e. that the Debtor is prohibited from *retaining* any net profits, until all unsecured creditors are paid in full, and that all net profits must be first allocated to an annual pro rata dividend, but that in any event, the Debtors *must* pay 111% of all allowed unsecured claims over five years. If the Debtors were only obligated to pay an annual pro rata dividend out of net profits, only if net profits were available, there would be no need to even insert a fixed annual percentage of dividend to be paid, and what the total fixed percentage dividend would be. The Debtors would merely need to state that an unspecified dividend would be paid only if there were net profits available to do so.

The Amended Plan provides that the projected dividend of $166,642.32 "will be paid in annual installments".

"Will" is defined as follows:

**Will,** v. An auxiliary verb commonly having the mandatory sense of "shall" or "must." It is a word of certainty, while the word "may" is one of speculation and uncertainty.

Blacks Law Dictionary, p. 1598 (6th ed. 1990).

▉▉▉▉ The word "will" should be given its usual and common meaning unless that word is otherwise defined in the document to be construed, or its use in a specific context would compel a conclusion that another definition was intended. *Huntington Mut. Ins. Co. v. Walker,* 181 Ind.App. 618, 392 N.E.2d 1182, 1185 (1979); *Marksill Specialties, Inc. v. Barger,* 428 N.E.2d 65, 69–70 (Ind.App.1981). The meaning held by one party may not be invoked to change the ordinary denotation of a word. *TKO Equipment Co. v. C & G Coal Co.,* 863 F.2d 541 (7th Cir.1988), *rehg. den.* Here, there is no reason not to give the word "will" its normal definition, and thus the Court concludes that the Debtors must pay a 111% dividend to unsecured creditors over five years.

Clearly, the projected gross income, expenses, and payment of administrative and secured claims as set out in Exhibits "C" and "D", were just that, i.e. they were estimates of the Debtor's future performance and the Debtor's ability to generate the necessary positive cash flow to fund a 111% dividend to unsecured creditors. Those projections were presumably based on valid underlying historical financial data and certain assumptions. Based on that

data as to the Debtor's future ability to perform, there could certainly be no guaranty by the Debtors that those projected figures would come to fruition. However, the Court deems these *pro forma* financial statements as merely an attempt to convince the unsecured creditors that the Amended Plan was feasible, as is required by § 1129(a)(11), in order to obtain the necessary acceptances for confirmation of the Amended Plan, and the mere failure of the Debtors to ultimately meet those financial goals does not mean that the promised dividend was not due and owing.

To this Court the fact that the Amended Plan provided that the dividend was only to be paid out of net profits did not mean it was contingent on there actually being a net profit. It merely established the order of payments out of gross income, i.e. the Debtors had the right to pay operating expenses, administrative claims, and secured claims in the ordinary course of their business as they accrued before unsecured creditors were to be paid a dividend out of the net profits on an annual basis. It did not mean that unsecured creditors were not to be paid at all if there were no net profits.

In addition, it is obvious that both the Amended Plan and the Order confirming the same were drafted by Debtors' counsel, and that any ambiguities therein, or inconsistencies between the Order confirming the Amended Plan and the Amended Plan, or in the Amended Plan itself should be strictly construed versus the party whose attorney drafted the same.

It is therefore,

ORDERED, that this case is hereby reopened by the Court on its own motion. And it is further,

ORDERED, that no Court costs need be paid to reopen this case. And it is further,

ORDERED, that the Order confirming the Amended Plan and the Amended Plan as confirmed is certain and unambiguous as a matter of law and parol or extrinsic evidence is not admissible to expand, vary, or explain the same. And it is further,

ORDERED, that the Order confirming the Amended Plan, and the Amended Plan as confirmed, impose upon the Debtors an unconditional obligation to pay all unsecured creditors a total dividend of 111% over five years in annual installments, and that this obligation is not conditioned upon net profits being available to do so.

The Clerk shall enter this Order on a separate document pursuant to Bankr.R. 9021.