**WASHINGTON NATIONAL CORPORATION, Plaintiff-Appellant,**

v.

**SEARS, ROEBUCK & CO., Defendant-Appellee.**

**No. 1–384A63.**

Court of Appeals of Indiana, First District.

Feb. 13, 1985.

Rehearing Denied March 27, 1985.

John W. Van Buskirk, Patricia Seasor Bailey, Stark, Doninger, Mernitz & Smith, Indianapolis, Robert S. Ratcliffe, Terre Haute, for plaintiff-appellant.

Douglas J. Hill, Mark A. Sidebottom, Hill, Fulwider, McDowell, Funk & Matthews, Indianapolis, Frederick T. Bauer, Bauer, Miller & Weber, Terre Haute, for defendant-appellee.

NEAL, Judge.

### STATEMENT OF THE CASE

Plaintiff-appellant, Washington National Corporation (WNC), appeals from a negative judgment of the Vigo Superior Court in its action against defendant-appellee, Sears, Roebuck & Co. (Sears), for unpaid rent computed on Sears' gross sales according to its percentage rent lease.

We affirm.

### STATEMENT OF THE FACTS

On June 7, 1968 Sears entered into a "Shopping Center Lease" (lease) with Honey Creek Square, Inc. (Honey Creek), to lease space in its mall, Honey Creek Square Shopping Center. The lease became effective on November 1 of that year for a term of 30 years plus 4 five-year options. WNC is the successor to and assignee of Honey Creek's rights under the lease.

The lease is a standard Sears form which was modified pursuant to negotiations between Honey Creek and Sears before ratification. Rent due WNC by Sears under the lease is based solely on a percentage basis of Sears' net sales made on the Honey

Creek store, with no guaranteed minimum. The monthly amount is calculated according to paragraph 8 of the lease which reads, in pertinent part:

"(a) Tenant, in consideration of said demise, does covenant and agree with Landlord to pay as rental for all of said demised premises (including the above mentioned retail store and attached Tire Service Station) a sum equal to three per cent (3%) of so much of "Net Sales" (as herein defined), made by Tenant upon the demised premises during any Lease Year (as herein defined) during the first three (3) years of the term hereinabove provided, as are not in excess of Eight Million Dollars ($8,000,000), and a sum equal to two and one-half per cent (2½%) of so much of such Net Sales made by Tenant upon the demised premises during any Lease Year commencing with the fourth year of said term and continuing thereafter to the end of said term, as are not in excess of Eight Million Dollars ($8,000,000), and a further sum, applicable during the entire lease term, equal to one and one-half per cent (1½%) of such Net Sales as are in excess of Eight Million Dollars ($8,000,000), said rentals to be paid in monthly installments within fifteen (15) days after the end of each calendar month during the term hereof.

(b) The words "Net Sales" as used herein mean gross sales made upon the demised premises by Tenant and its departmental sublesses, concessionaires and licensees occupying space upon said demised premises, but deducting or excluding, as the case may be, the following: (i) Sales of departments or divisions not located upon said demised premises; (ii) The amount of all sales, use, excise retailers' occupation or other similar taxes imposed in a specific amount, or percentage upon, or determined by, the amount of retail sales made upon said demised premises; (iii) Returns and allowances, as such terms are known and used by Tenant in the preparation of Tenant's profit and loss statements; (iv) Delivery, rental, installation and service charges; (v) Amounts in excess of Ten-

ant's (or of its sublessees', concessionaires' and licensees'), cash sales price charged on sales made on credit or under a time payment plan; (vi) Sales of merchandise ordered through the use of Tenant's catalog order channels, regardless of the place of order, payment or delivery; (vii) Policies of insurance sold on said demised premises and the premiums collected on policies of insurance; (viii) Sales made through the Commercial and Industrial Sales Department of Tenant."

Sears paid rent to Honey Creek Square, Inc., and its successor/assignee WNC, without incident until December, 1981 when WNC requested and carried out an audit in accordance with the terms of the lease. The auditor's report stated that in December, 1981, Sears did not include in net sales the following:

| | |
|---|---|
| Alteration Sales | $ — |
| Gift Wrapping Sales | 1,262 |
| Bike Set-up sales | 112 |
| Auto Labor Sales | 16,269 |
| Service Contract (Maintenance Agreement) Sales | 53,513 |
| Service Center Sales | 13,217 |

Sears admits that these amounts were not included in its report of net sales for December, 1981. Sears stated it had never included income from these categories in its net sales figure, except "auto labor" which had been included from November, 1977 through September, 1981 due to a misunderstanding on the part of its in-store controller.

WNC sued Sears to recover rent based on the above exclusions from net sales. The trial court found that under the lease "gross sales" means sales of merchandise or property and that each contested category constitutes a *service* provided by Sears and profits generated therefrom had properly been excluded from net sales under provision 8(b)(iv) of the lease. WNC appeals this decision. We affirm.

## ISSUE

Consolidating the two arguments made by WNC, we find one basic issue:

Whether the trial court erred in interpreting the lease to exclude from net sales all monies received by Sears through gift wrapping, clothes alteration, bike set-up, auto labor, maintenance agreements and appliance repair.

## DISCUSSION AND DECISION

█ WNC appeals from a negative judgment; therefore, we will reverse the decision only if the evidence viewed most favorably to the trial court ruling leads uncontrovertibly to the opposite conclusion. *Bohnke v. Bohnke*, (1983) Ind.App., 454 N.E.2d 446. WNC may only succeed if the trial court's judgment is contrary to law. *Kroger v. Haun*, (1978) 177 Ind.App. 403, 379 N.E.2d 1004.

The trial court made the following relevant findings of fact and conclusions of law:

### "FINDINGS OF FACT

6. The additional 'sales' reported in the audit relate to the following operations of Sears at its Honey Creek store:

(a) *Garment Alteration.* This occurs most often in men's clothing. When Sears sells clothing to a customer, some typical alterations (e.g. cuffs, sleeve shortening and lengthening) are included in the sales price. If a customer wants additional, more extensive alterations, a separate charge is made for that service. The separate charge for the additional alteration service is not included by Sears in its report of net sales.

(b) *Gift Wrapping.* Sears maintains a gift wrap counter at which customers may have gift wrapped merchandise which is purchased at Sears or from other stores. The major part of the cost to Sears of operating this department is the labor costs. The costs of wrapping paper and materials are incidental to the service. Sears does not report its income from gift wrapping in net sales.

(c) *Bike Set-up.* Sears sells bicycles which are purchased in a box by customers at the sales price. The bicycles require some assembly which can be done by the customer. Sears also offers to its customers the service of assembling bicycles for an additional fee. When requested, the bicycles are set-up or assembled by Sears employees at the store, and the separate charge for the set-up is not reported in net sales.

(d) *Auto Labor.* Sears maintains an auto center at which it sells auto and truck parts directly to customers, sells and installs parts, and services autos and trucks which may or may not involve the installation of parts. The sales prices of all parts, whether sold directly or as part of service or installation, are reported as net sales. Charges to the customer for labor performed by Sears' mechanics in installation or service in the auto center, are not reported in the net sales.

(e) *Service Center Labor.* Sears operates a service center at which Sears' employees service and repair appliances purchased from Sears. Repairs are made at the Service Center or in the home and may be as a result of (a) independent requests by customers, (b) Sears' warranties, or (c) pursuant to a maintenance agreement. (The maintenance agreements or service contracts were set out as a separate category in the audit. Service under warranties is provided without separate-charge and is not an issue). When a customer requests and receives service of an appliance, there is a service charge for the labor and if new parts are necessary, there is a charge to the customer for the parts. The sale of the parts is reported in net sales; the charge for service or labor is not included in net sales.

(f) *Maintenance Agreements.* These were called 'service contracts' in the audit. Sears will contract with a customer for a fee to service and repair a Sears' appliance during a specified period of time. The fee is a fixed amount charged the customer at the inception of the agreement. The contract is in writing and under its terms Sears agrees to furnish parts and service necessary to maintain the appliance in proper operating

condition, and to provide an annual preventive maintenance check-up. The work is performed by the Service Center. It cannot be determined at the time the fee is received what amount, if any, would be attributable to service or parts. As parts are used for repairs under maintenance agreements, Sears reports those parts in its records for inventory control purposes. No records are kept of amounts of labor attributable to maintenance agreements. It is not possible to determine what part of a fee for a particular contract is for parts and what part is for service or labor.

7. In the lease the parties did not define the term 'gross sales'. There is an absence of credible evidence that the parties intended to give to the terms 'sales' or 'gross sales' any meetings other than their normal meanings.

8. The normal meaning of a 'sale' in Indiana and under Indiana law is the passing of title from a seller to a buyer for money; a transfer of property in exchange for consideration.

9. Under the lease gross sales include only amounts received by Sears in exchange for transfer of title to merchandise. Amounts received for labor or services are not sales and are not included in gross sales.

10. With regard to garment alterations, bike set-up, auto labor, and service center labor, the amounts at issue represent income or receipts of Sears purely for labor or services rendered by Sears. No sales are included in those amounts. Any sales of merchandise by Sears which may relate to these services (e.g. sales of garments, bicycles, auto parts or appliance parts) are properly included in gross sales and reported as net sales.

11. The merchandise or property provided to the customer as part of the gift wrapping service is incidental to the service. The amounts received for gift wrapping do not represent sales and are not included in gross sales.

12. The fee charged a customer for a maintenance agreement is not in exchange for the transfer of title to merchandise or property, and therefore is not a sale and not included in gross sales. In exchange for the fee the customer receives the service of a preventive maintenance check-up, if requested, and, if necessary, to maintain the covered appliance in operating condition during the term of the contract, an undetermined amount of service and parts. When the fee is taken into income, there is no way to determine the amount of the fee which may be attributable to parts and the amount attributable to service. While parts used under maintenance agreements are later accounted for for inventory purposes, the inclusion of the prices of those parts used would not accurately reflect the portion of the original fee which represents parts. The supply of parts is incidental to the services rendered.

13. The terms of the lease between the parties exclude from net sales '[d]elivery, rental, installation and service charges.' The intent of the parties to the agreement was to exclude from sales amounts charged customers for services or labor. This express exclusion of charges for services reinforces the finding that the parties intended the word 'sale' to have its normal meaning of a passing of title to property for consideration.

## CONCLUSIONS OF LAW

2. Under Indiana law a 'sale' has a well-defined meaning and is the passing of title from a seller to a buyer for money; in other words, a transfer of property in exchange for consideration.

3. The providing of services or labor in exchange for a fee is not a sale.

4. Under the lease agreement between WNC and Sears the term 'gross sales' means sales of property or merchandise. The term 'gross sales' does not include income from services of labor.

5. Under the lease agreement between WNC and Sears, income from services or labor is excluded from net sales.

6. Sears income at its store in Honey Creek Square Shopping Center in Terre Haute, Indiana from garment alterations, gift wrapping, bike set-up, auto labor, service center labor, and maintenance agreements, is not from sales, and is not included in gross sales or net sales as those items appear in paragraph 8 of the lease agreement between the parties.
7. Under plaintiff's complaint WNC has not proven by a preponderance of the evidence the essential elements of its claim."

■ WNC accuses the trial court of misapplying the rules of contract construction by accepting extrinsic evidence on the intent of the parties yet finding the lease unambiguous. The record reveals the only extrinsic evidence entered at trial was the testimony of a witness for WNC regarding his personal understanding of the phrase "gross sales". Sears objected to this testimony and the court indicated it would only go to the weight of the evidence concerning the meaning of the 8(b)(iv) exclusion of service charges. WNC cannot now complain such evidence is inadmissible. Nor can WNC use the court's admission of it's witness' testimony to prove the lease provision 8(b) is ambiguous. *Orkin Exterminating Company v. Walters*, (1984) Ind. App., 466 N.E.2d 55. The trial court found WNC had not met its burden of proving "gross sales" and "service charges", as used in the lease, were intended to have any but their common meanings. We agree.

■ Language in a contract should be given its plain and ordinary meaning unless a particular term is used in a manner intended to convey a specific technical concept. *Keystone Square Shopping Center Company v. Marsh Super Markets, Inc.*, (1984) Ind.App., 459 N.E.2d 420. Where the terms of a contract are not ambiguous; that is, where reasonable men would not find them subject to more than one interpretation, the meaning of those terms is a matter of law for the trial court to determine. *Fort Wayne Cablevision v. Indiana & Michigan Electric*, (1983) Ind.App.,

443 N.E.2d 863. In so doing, the court should read all of the contract's provisions together to harmonize the words and phrases used and to give effect to the parties' intentions as established at the time they entered into the agreement. *Loving v. Ponderosa Systems, Inc.*, (1983) Ind.App., 444 N.E.2d 896. Here, the trial court found "gross sales" referred to the exchange of merchandise for money, following the common definition of a sale as the trade-off of title to property for consideration. *See generally Wayne Pump Co. v. Dept. of Treasury*, (1953) 232 Ind. 147, 110 N.E.2d 284; *Union Securities, Inc. v. Merchants' Trust and Savings Co.*, (1933) 205 Ind. 127, 185 N.E. 150. The court then consistently read the 8(b)(iv) exclusion of "service charges" as addressing those customer services performed by Sears in conjunction with its sale of merchandise; namely alterations, gift wrap, bike set-up, auto labor, maintenance contracts and appliance repair.

■ WNC next argues the trial court assigned erroneous meanings to the phrases "gross sales" and "service charges" as they appear in provision 8(b) of the lease. It asserts that services performed at the Honey Creek store were never intended to be excluded from net or gross sales, according to the normal usage of the latter term in the retail sales industry, as it is entitled to receive a return on Sears' location. In order to "maintain the integrity of the language of the lease and effectuate the purpose for a percentage rent provision" WNC contends only those "off-premise, incidental services specifically excluded pursuant to the exclusionary language 'delivery, rental, installation and service charges'," which services are often performed by independent contractors, were meant to be omitted from "gross sales" and Sears' rent computation. WNC cites no Indiana case or statutory law for its position but relies upon treatises and law journal notes as authority for its premise that fees paid for services fall within the

ambit of gross sales.[1] Sears refutes such notion through citation of yet another note[2] and advances the Uniform Commercial Code and our statutory treatment of retail sales for tax purposes as support for the exclusion of all labor and service charges. *See* IND.CODE 6–2.5–4–1, 6–2.5–2–1, 6–2.5–4–1, 26–1–2–106.

However, we need not define the general rule regarding the inclusion of service charges in gross sales for the purpose of computing percentage rental due under a shopping center lease to decide the present case. Moreover, "[a]n examination of the cases [dealing with percentage leases] reveals no generally accepted or uniform legal rules with regard to whether a particular cost of receipt should be included or excluded from the computation of rentals". Annot., 58 A.L.R.3d 384, 396. Here, provision 8(b)(iv) of the lease between Sears and WNC excludes "service charges" from gross sales in arriving at net sales. WNC's witness who had negotiated the lease arrangement for Honey Creek testified he had previously negotiated over two hundred shopping center leases and that he had examined the first draft of Sears' lease before it became final. If Honey Creek or WNC intended only "off-premise, incidental" services to be excluded, it should have insisted the 8(b)(iv) provision be drafted to specify this. *Cf. Pomona Valley Center, Inc. v. Nash's of Pomona,* (1961) 190 Cal. App.2d 537, 12 Cal.Rptr. 83. As it appears in the final, signed lease the provision excludes all monies received by Sears for all of the various services rendered its customers.

This is not an unreasonable interpretation of the percentage rental agreement as a customer normally avails himself of the services offered by Sears only when necessary or beneficial to the use of a product purchased there. For example, when purchasing a set of Sears tires, a customer is likely to have them put on his car and balanced in Sears automotive center as a matter of convenience. The price of the tires, which far exceeds the labor cost involved, is included in net sales. Thus WNC does receive rent on the automotive center. The same is true of each of the other, disputed service categories, as set out in the findings of the trial court.

WNC's argument that maintenance agreements, or "service contracts", must be differentiated from the other services provided by Sears and included in net sales is not convincing. WNC insists the purchase of a maintenance agreement constitutes the exchange of consideration for a tangible contract. However, the consumer is actually paying for Sears' promise to "service" or repair an appliance for a set period of time. The price of the appliance is included in net sales; however, the cost to maintain it is not. In some instances Sears may earn a profit on its maintenance agreements but in others it will lose money through multiple repairs done as a service for the convenience of the consumer.

We find the trial court properly applied the common meanings of the terms "gross sales" and "service charges" and thereby interpreted the lease to exclude from rent due the monies received by Sears for gift wrapping, alterations, bike set-up, auto labor, service contracts and appliance repair. The decision of the trial court is affirmed.

Judgment affirmed.

RATLIFF, P.J., and ROBERTSON, J., concur.

---

1.  *See* M. Friedman, *Friedman on Leases,* Vol. 1, Sec. 6.4, 173; Hemingway, *Selected Problems in Leases of Community and Regional Shopping Centers,* 16 Baylor L.Rev. 1 (1964); Landis, *The Drafting of Percentage Leases,* 11 U.Toronto L.J. 43 (1955); S. McMichael, *Leases—Percentage, Short and Long Term,* (4th ed. 1947); Note, *The Percentage Lease—Its Function and Drafting Problems,* 61 Harv.L.Rev. 317 (1948); Annotation, *Rent Due Under Commercial Percentage Lease,* 58 A.L.R.3d 384.

2.  Van Doren, *Some Suggestions for the Drafting of Long Term Net Percentage Leases,* 51 CO-LUMB.L.REV. 186, (1951).