**In the Matter of John Lee PENROD, Alyce Jean Penrod, Debtors.**

**Bankruptcy No. 87–30501.**

United States Bankruptcy Court, N.D. Indiana, South Bend Division.

March 3, 1994.

Daniel J. Skekloff, Fort Wayne, IN, for debtors.

Mark R. Wenzel, Indianapolis, IN, for Financial Institutions Liquidation Corp. f/k/a Mut. Guar. Corp., Successor in Interest to the Clinton County Farm Bureau Co-op. Ass'n Credit Union.

## DECISION and ORDER

ROBERT K. RODIBAUGH, Bankruptcy Judge.

This matter is before the court on CITATION FOR CONTEMPT ("Motion"), which was filed on September 14, 1992, by John Lee Penrod and Alyce Jean Penrod against Financial Institutions Liquidation Corporation f/k/a Mutual Guaranty Corporation, Successor in Interest to the Clinton County Farm Bureau Cooperative Association Credit Union. The parties filed a Stipulation of Facts on May 28, 1993. Each party then submitted memoranda in support of its position, after which the matter was taken under advisement.

### Jurisdiction

This decision and order shall represent findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable in this proceeding by Federal Rules of Bankruptcy Procedure 7052 and 9014. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(K) and (O), over which the court has jurisdiction pursuant to 28 U.S.C. § 157(b)(1).

In addition, this court expressly stated its intention to retain jurisdiction over this case until the Plan of Reorganization ("Plan") is

completed.[1] Even without a specific retention provision in the Plan, jurisdiction of the bankruptcy court continues post-confirmation as to fundamental questions of interpretation and administration of the Plan. *In re Doty,* 129 B.R. 571, 586 (Bankr.N.D.Ind.1991); *see also In re Hermitage Bldg. Corp.,* 100 F.2d 597, 599 (7th Cir.1938); *Shores v. Hendy Realization Co.,* 133 F.2d 738 (9th Cir.1943). Therefore, this dispute is a matter over which the court has jurisdiction.

*Background*

The Stipulation of Facts is briefly summarized below.

Financial Institutions Liquidation Corporation f/k/a Mutual Guaranty Corporation ("Mutual Guaranty") is the Successor in Interest to the Clinton County Farm Bureau Cooperative Association Credit Union ("Credit Union").[2] Mutual Guaranty has succeeded to all of the Credit Union's rights to collect the loan obligations owed to the Credit Union by John Lee and Alyce Jean Penrod (jointly referred to as "Penrods").

On February 13, 1986, the Penrods executed and delivered a Promissory Note payable to the Credit Union in the principal amount of $150,000 plus interest. To secure repayment of the Promissory Note, the Penrods executed and delivered to the Credit Union a Security Agreement and Financing Statement, which granted a security interest in, *inter alia,* all of the Penrods' hog livestock and the proceeds and products thereof. The Credit Union's security interest was duly perfected on February 16, 1986.

On March 27, 1987, the Penrods filed their voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. The Credit Union filed its proof of claim on June 2, 1987, setting out the amount of its secured claim as $154,625.13. The Penrods made no objection to the Credit Union's proof of claim.

On June 8, 1987, the Credit Union filed a Motion for Relief from Automatic Stay and for Adequate Protection, alleging the Penrods' failure to comply with the terms of the Promissory Note and Security Agreement. Thirteen days later, this court entered an order requiring the Penrods to pay to the Credit Union monthly adequate protection payments in the sum of $1,437.13 until further order of the court. The Penrods have duly paid all such adequate protection payments.

On May 6, 1988, the Penrods filed their Chapter 11 Plan. In their Plan, the Penrods proposed to pay the Credit Union in full, with interest at the rate of eleven percent per annum. The Credit Union participated in the Chapter 11 case in addition to submitting a ballot accepting the Plan.[3]

On June 21, 1990, this court entered an Order Confirming Plan, in which the Penrods' Plan was confirmed, with certain modifications which do not pertain to the Credit Union. The Plan, as confirmed, provided for the restructuring and full payment of the Credit Union's claim. The Penrods are current on all payments required under the confirmed Plan.

Between June 1, 1990, and July 1, 1991, the Penrods sold and/or liquidated their entire hog herd.[4] Upon learning of this, Mutu-

1. Paragraph 10 of the Plan of Reorganization, filed on May 6, 1988, contains the following language:

   The Court will retain jurisdiction in this case until this Plan has been fully consummated. On June 21, 1990, the court entered an Order Confirming Plan, which made certain modifications to the Plan of Reorganization, but did not alter Paragraph 10.

2. On March 31, 1989, Mutual Guaranty was appointed as Receiver for liquidation of the Credit Union by the Indiana Department of Financial Institutions. Prior to such action, no motion to lift the automatic stay (in effect under 11 U.S.C.

§ 362) was filed with the court. Mutual Guaranty never filed an appearance with this court. However, on September 18, 1992, Mark R. Wenzel, Esq., entered his appearance for Financial Institutions Liquidation Corporation f/k/a Mutual Guaranty Corporation, Successor in Interest to the Clinton County Farm Bureau Cooperative Association Credit Union.

3. On November 14, 1988, the Credit Union submitted its ballot accepting the Plan.

4. The Plan was confirmed on June 21, 1990, approximately 20 days after the Penrods began to sell their hog herd. There is no evidence indicating how much of the hog herd was sold

al Guaranty began negotiating with the Penrods to obtain replacement collateral. The Penrods, through their counsel, advised Mutual Guaranty, through its counsel, that any action on the part of Mutual Guaranty, under the circumstances of this case, would be in violation of the confirmed Plan.

On February 21, 1992, Mutual Guaranty filed with the Wabash Circuit Court a cause of action entitled *Financial Institutions Liquidation Corporation f/k/a Mutual Guaranty Corporation as Successor in Interest to the Clinton County Farm Bureau Cooperative Association Credit Union v. John Lee Penrod and Alyce Jean Penrod,* Cause No. 85C01–9202–CP–72 ("State Court Action").[5] In the State Court Action, Mutual Guaranty alleged that the Penrods were in default of their obligations to it. Mutual Guaranty sought to recover, *inter alia,* a judgment for the balance of the Penrods' indebtedness to it, together with attorney fees.

In response, the Penrods filed their motion on September 14, 1992. In their Motion, the Penrods seek an order (1) finding that Mutual Guaranty is in contempt of this court's orders, (2) assessing their attorney fees to Mutual Guaranty, and (3) for all other just and proper relief.

### Discussion

This dispute arose out of a difference of opinion concerning interpretation of the Plan. The Penrods claim that they have complied with all of the terms and conditions of the Plan with respect to Mutual Guaranty, and that, as a result, Mutual Guaranty is in contempt of court because it filed the State Court Action. Mutual Guaranty, on the other hand, alleges that the Penrods did not comply with the terms and conditions of the Plan in that the Penrods sold property upon which the Credit Union had obtained a lien;

the sale being a violation of the terms and conditions of its security agreement. Mutual Guaranty asserts that, because it was considered a secured creditor under the Plan, it retained its lien under the Plan. Therefore, argues Mutual Guaranty, the sale of the property, which violated the terms and conditions of its security agreement, violated the terms and conditions of the Plan.

The underlying issue before the court is whether a lien exists after confirmation of a Plan that vacates a pre-petition lien, but does not specifically mention termination of said lien.

### I. 11 U.S.C. § 1141

The logical starting point for analyzing this issue is § 1141 of the Code. Section 1141 provides in pertinent part:

(a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in, the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

(c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and

---

prior to confirmation of the Plan. The litigants merely stipulated that:

Hog sales by the Penrods between June 1, 1990 and July 1, 1991, total the sum of Two hundred twenty nine thousand four hundred one dollars and twenty five cents ($229,-401.25). The balance of the hog herd which was under pseudo-rabies quarantine was liquidated in the Spring of 1991, being completed on July 1, 1991.

5. Because more than 180 days had passed since the date the Order of Confirmation was entered, Mutual Guaranty was precluded from requesting that the bankruptcy court revoke the Order of Confirmation, pursuant to 11 U.S.C. § 1144. Meanwhile, the injunction against attempting to collect a discharged debt, accorded by 11 U.S.C. § 524(a)(2), was still in full force and effect.

interests of creditors, equity security holders, and of general partners in the debtor.

11 U.S.C. § 1141 (Callaghan 1993–94).

The gravamen of this issue is the language of § 1141(c) which states "except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors...." Although appearing straightforward, this provision has spawned case law with diverse interpretations of it.

Mutual Guaranty cites *Matter of Tarnow*, 749 F.2d 464 (7th Cir.1984) as the controlling case law on point in this jurisdiction. However, *Tarnow* arose solely in the context of proof of claim litigation and extinguishment of a lien for failure to file a timely claim.[6] *In re Henderberg*, 108 B.R. 407, 413 (Bankr. N.D.N.Y.1989). In the case at bar we have an active creditor, represented by competent counsel,[7] that filed a written acceptance to a plan that extinguished its lien with the plan being confirmed by the court with no objection or appeal of the court's order.

Mutual Guaranty relies on, *inter alia, Relihan v. Exchange Bank*, 69 B.R. 122 (S.D.Ga.1985) for the proposition that "prebankruptcy liens are unaffected by a debtor's Chapter 11 bankruptcy case unless the debtor takes affirmative steps to challenge the lien."[8] The court in *Relihan* held that § 1141 does not act to extinguish valid prepetition liens. *Relihan*, 69 B.R. at 127. The court reasoned:

The language of 1141(c) is "free and clear of any claim or interest." "Claim" is defined in Code § 101(4).[9] A "claim" is dis-

tinct from a "lien," which is defined in Code § 101(31).[10] The term "interest" is not defined in the Code, "but it would be odd if Congress had chosen that undefined term to mean 'lien,' when [it] could have used the defined term 'lien' and avoided uncertainty."

*Id.* (footnotes in original).

Confusingly, the court in *Relihan* concluded that, although "[l]ien means charge against or *interest* in property to secure payment of a debt or performance of an obligation," "[t]he term 'interest' is not defined in the Code," and "it would be odd if Congress had chosen that undefined term to mean 'lien'...." *Relihan*, 69 B.R. at 127 (emphasis added). This court notes that, although "interest" is not defined to mean a lien, "lien" is specifically defined to mean "interest." See 11 U.S.C. § 101(31).[11]

The court's reasoning in *Relihan* was criticized in *In re Arctic Enterprises, Inc.*, 68 B.R. 71 (D.Minn.1986). The court in *Arctic Enterprises* stated:

the term "interests" as used in section 1141(c) subsumes the term "lien." As authority for this proposition the bankruptcy court cited several sections of the code wherein the word "interest" is commonly understood to mean all property rights including lien rights. *See, e.g.,* 11 U.S.C. §§ 101(28), 361, 363(f), 363(h), and 541. For example, in section 361 of the Code, setting forth procedures for adequate protection, the term "interest" has been judicially construed to encompass liens. Section 363(f)(3) permits a bankruptcy trustee to sell property "free and clear of any *interest* in such property of an entity other than the estate," provided that "*such inter-*

---

**6.** The debtor had not challenged the lien per se, but only that the secured claim had not been timely filed.

**7.** Richard D. Martin entered a Notice of Appearance for the Credit Union on May 12, 1987. Mr. Martin's appearance has never been withdrawn.

**8.** Certainly this is a correct statement of law, but the Credit Union overlooks the fact that the Penrods have taken such steps in negotiating, through the Plan, a new agreement with the Penrods which eliminated the lien.

**9.** "Claim means—
(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliqui-

dated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured...."

**10.** "Lien means charge against or interest in property to secure payment of a debt or performance of an obligation[.]"

**11.** Although the definition of the term "lien" was codified at § 101(31) at the time the court in *Relihan* wrote its opinion, the Code has since been amended. The definition of the term "lien" is now found at § 101(37). See 11 U.S.C. § 101(37) (Callaghan 1993–94).

*est is a lien . . ."* and certain price restrictions are met. In addition, the legislative statements accompanying section 541(a) of the Code make clear that the term "interest in property" as used in that section "is an all-embracing definition which includes . . . liens [held by the debtor on property of a third party]. . . ."

*Arctic Enterprises,* 68 B.R. at 79 (citations omitted) (emphasis added).

This court too is unpersuaded by the reasoning in *Relihan,* as well as the other cases cited by Mutual Guaranty.[12] The definition of the term "lien" coupled with the many instances under the Code in which the term "interest" is used coextensively with the term "lien" persuade this court that § 1141(c) does, in fact, cover liens.

This interpretation of § 1141(c) is supported by substantial case law. See *In re Johnson,* 139 B.R. 208 (Bankr.D.Minn.1992); *Matter of Depew,* 115 B.R. 965 (Bankr. N.D.Ind.1989); *In re Henderberg,* 108 B.R. 407 (Bankr.N.D.N.Y.1989); *In re Fischer,* 91 B.R. 55 (Bankr.D.Minn.1988); *In re Arctic Enterprises, Inc.,* 68 B.R. 71 (D.Minn.1986); *In re Pennsylvania Iron and Coal Co., Inc.,* 56 B.R. 492 (Bankr.S.D.Ohio 1985); and *In re American Properties,* 30 B.R. 239 (Bankr. D.Kan.1983).

Accordingly, the court will find that all liens not expressly preserved by the terms of the Plan of Reorganization are voided by the confirmation of that Plan, and creditors are precluded from asserting or enforcing such void lien rights in later judicial proceedings.

## II. Effect of Confirmation

■ As was so aptly stated by the court in *In re American Properties, Inc.,* 30 B.R. 239 (Bankr.Kan.1983):

12. The following cases cited by Mutual Guaranty are distinguishable from the present case for the reasons given:

*General Elec. Credit Corp. v. Nardulli & Sons, Inc.,* 836 F.2d 184 (3rd Cir.1988) (plan expressly provided for retention of lien); *Estate of Lellock v. Prudential Ins. Co. of America,* 811 F.2d 186 (3rd Cir.1987) (debtors filed Petition for Relief under Chapter 7 of the Bankruptcy Code); *In re Eakin,* 153 B.R. 59 (Bankr.D.Idaho 1993) (involved debtors in a Chapter 7 bankruptcy case); *In re Howell,* 84 B.R. 834 (Bankr.M.D.Fla.1988) (case dealt with a debt that was non-dischargea-

The effect of [§ 1141 is] far-reaching. After confirmation of a chapter 11 plan, a creditor's lien rights are only those granted in the confirmed plan. A creditor no longer can enforce its pre-confirmation lien rights; a creditor must seek to enforce its lien rights granted in the plan, rather than its pre-chapter 11 lien rights.

*American Properties,* 30 B.R. at 246.

■ The order of confirmation binds not only creditors, but debtors as well; it is a two-edged sword. *Matter of Depew,* 115 B.R. at 973. Case law amply supports the proposition that, post-confirmation, a debtor is bound only by its payment obligations set forth in the plan. *In re Water Gap Village,* 99 B.R. 226, 229 (Bankr.D.N.J.1989). The effect of confirmation is to discharge the entire pre-confirmation debt, replacing it with a new indebtedness as provided in the confirmed plan. *In re Water Gap Village,* 99 B.R. at 229; *In re Ernst,* 45 B.R. 700, 702 (Bankr.D.Minn.1985). The plan is essentially a new and binding contract, sanctioned by the court, between the debtors and their pre-confirmation creditor. *In re L & V Realty Corp.,* 76 B.R. 35 (Bankr.E.D.N.Y.1987); *In re Water Gap Village,* 99 B.R. at 229; *In re Ernst,* 45 B.R. at 702.

In *In re L & V Realty Corp.,* 76 B.R. at 37, the court quoted with approval Bankruptcy Judge Babbit who stated the following in *In the Matter of United Merchants and Manufacturers, Inc.,* 24 C.B.C. 220, 226–27 (Bankr. S.D.N.Y.1981):

At its simplest, a plan is an offer of promises made by a debtor and accepted by the creditors following protracted negotiations.

ble under § 523(a)(6)); *In re Balogun,* 56 B.R. 117 (Bankr.M.D.Ala.1985) (plan required debtor to cure arrearages and make payments as they became due under the original agreement between the parties); *In re Ernst,* 45 B.R. 700 (Bankr.D.Minn.1985) (plan required payments to satisfy the allowed amount of a secured claim held by a creditor possessing a validly perfected mortgage); *In re Snedaker,* 39 B.R. 41 (Bankr. S.D.Fla.1984) (plan did not provide for payment of the creditor's secured claim or mention the property that was subject to garnishment debt; plan only dealt with the creditor's unsecured claim).

In many of its most vital aspects, a plan is a kind of contract involving, as it does, matters of offer, acceptance, performance and the like. Accordingly, disputed provisions should be interpreted in light of general contract principles ... This court hopefully will be pardoned if it borrows the historic meter of Chief Justice Marshall, albeit in considerably less heroic circumstances, that "it is a contract we are expounding."

*Id.* 76 B.R. at 37.

Following the foregoing reasoning, the court concludes that the Plan, as approved by the Order Confirming Plan entered pursuant to 11 U.S.C. § 1129, is analogous to a contract between the Penrods and Mutual Guaranty. As a result, principles of contract construction and the parol evidence rule are applicable.

### III. Interpretation of the Plan

■ State law controls as to the construction of an ordinary contract. *Transcontinental & Wester Air, Inc. v. Koppal,* 345 U.S. 653, 73 S.Ct. 906, 97 L.Ed. 1325 (1953). Indiana law provides that where there is no ambiguity found in a contract, its construction is a matter of law for the court. *In re Doty,* 129 B.R. 571, 591 (Bankr.N.D.Ind. 1991); *Piskorowski v. Shell Oil Co.,* 403 N.E.2d 838, 844 (Ind.App.1980).

■ A contract is ambiguous if a reasonable person could find its terms susceptible to more than one interpretation. *Piskorowski,* 403 N.E.2d at 844. In other words, ambiguity exists when reasonably intelligent persons reach different conclusions as to the meaning of an instrument. *Shahan v. Brineger,* 181 Ind.App. 39, 390 N.E.2d 1036 (1979).

■ If the court can glean the intention of the parties to a contract, that intention must be effectuated, for that is the primary and overriding purpose of contract law—to ascertain and give effect to the intentions of the parties. *In re Doty,* 129 B.R. at 592; *Walb Constr. Co. v. Chipman,* 202 Ind. 434, 175 N.E. 132, 134 (1931); *Piskorowski,* 403 N.E.2d at 844.

■ In determining the meaning of contractual terms, the court must read all of the contract's provisions together to harmonize words and phrases used, and to give effect to the parties' intentions as established at the time they entered into the agreement. *Washington Nat. Corp. v. Sears, Roebuck & Co.,* 474 N.E.2d 116 (Ind.App.1985). Parol or extrinsic evidence is inadmissable to expand, vary, or explain an instrument unless there is a showing of fraud, mistake, ambiguity, illegality, duress, or undue influence. *Orme v. Estate of Kruwell,* 453 N.E.2d 355 (Ind.App. 1983).

### A. Treatment of Class III Under the Plan

■ On June 21, 1990, pursuant to 11 U.S.C. § 1129, the court entered its Order Confirming Plan, in which the court confirmed the Penrods' Plan, with certain modifications which do not pertain to the Credit Union. Under the Plan as confirmed, Mutual Guaranty is a Class 3 creditor. Mutual Guaranty was the only creditor designated to this class. Class 3 was to be paid as follows:

*Class 3:* This Class will be paid in full, with interest at the rate of eleven percent (11%) per annum. Payments to this Class shall be paid on a monthly basis commencing sixty (60) days after Confirmation. Furthermore, said payments shall be based upon a seven (7) year amortization.

This language is straight-forward and unambiguous. It contains no legalese, and it does not attempt to confuse the reader or hide terms and conditions. Certainly, reasonably intelligent persons could not reach different conclusions as to its meaning.

Throughout the Chapter 11 case, the Credit Union, represented by counsel, participated vigorously. On June 8, 1987, the Credit Union filed a Motion for Relief from Automatic Stay and for Adequate Protection, which, after being granted, required the Penrods to make adequate protection payments to the Credit Union in the amount of $1,437.13 per month. The Credit Union participated in the negotiation of the Plan, and, on November 14, 1988, submitted a ballot accepting the Plan (See Exhibit "L" of Joint Stipulation of Facts). It cannot be said that

the Credit Union was unaware or confused with respect to the terms and conditions with which it would be paid under the Plan.

The court concludes that the language and terminology employed in the Order Confirming Plan, and Plan as confirmed, is certain and unambiguous as a matter of law as it relates to the amount and number of payments to be made by the Penrods to Mutual Guaranty. Without elimination of the Credit Union's lien, the Penrods' Plan may not have been confirmable.

### B. Treatment of Other Classes Under the Plan

The Plan created twelve Classes. Seven out of the twelve Classes expressly provided for payment based upon the original, or slightly modified, terms and conditions of their respective agreements. These seven Classes successfully incorporated the terms and conditions of their original agreements, as modified, into the Plan. Of these seven Classes, four specifically provided for the retention of their secured status and security interests. To retain their security interests, these Classes provided clear and conspicuous language, such as:

1) shall retain its mortgage and its security interest;

2) deemed to have secured claims;

3) shall continue to be secured; and

4) all terms and provisions not specifically modified herein shall remain in full force and effect.

(See confirmed Plan).

Of the five Classes that did not provide for payment pursuant to their original agreements, only one was a secured creditor. That creditor, the Credit Union, did not provide for post-confirmation retention of its security interest and its secured status. Rather, it merely required that it be paid in full, with interest at the rate of eleven percent per annum, based upon a seven year amortization. A quick look at the Plan would have notified the Credit Union that other secured creditors were expressly providing for the retention of their security interests in the Plan, and that it too, absent a different

agreement with the Penrods, could have done so.

The Credit Union was referred to as a "secured creditor" in the Penrods' disclosure statement which, of course, was true at the filing of the statement. It was only after the parties had agreed to an extinguishment of the Credit Union's lien and the order of confirmation of the Plan became final that the lien disappeared.

It is not unusual for much bargaining and negotiation to be carried on before a plan is finally confirmed. Modification and restructuring of a lien that has no impact or effect on other creditors would not have required an amendment of the disclosure statement. Even an immaterial modification of the plan may be accomplished in the order of confirmation. The order of confirmation and the Plan constitute the contract between the Penrods and all creditors.

An examination of the Plan, which the Credit Union presumably undertook prior to casting its ballot affirmatively, leaves no doubt that the Credit Union's secured claim was to be dealt with solely by the Plan and that its lien was to be extinguished. The Credit Union appeared to be familiar with the mechanics of hog farming and should be held to the explicit provisions of the Plan for which it voted. Likewise, Mutual Guaranty is held to the explicit provisions of the Plan, for, as successor in interest, it stands in no different position than the Credit Union.

It should be noted as well, that Mutual Guaranty succeeded to the interests of the Credit Union prior to confirmation of the Plan and did nothing to provide for retention of its security interest in the Plan. As previously mentioned, the Plan was proposed on May 6, 1988. Although the Credit Union filed its ballot accepting the Plan on November 14, 1988, it was not until June 21, 1990, that the Plan was confirmed. Meanwhile, on March 31, 1989, Mutual Guaranty succeeded to all of the Credit Union's rights to collect loan obligations owed to it by the Penrods. For nearly fifteen months prior to confirmation of the Plan, Mutual Guaranty failed to make any effort to withdraw the Credit Union's ballot accepting the Plan, provide for

retention of its lien in the proposed Plan, or otherwise object to its treatment under the proposed Plan. Surely Mutual Guaranty was aware of the Credit Union's rights under the Plan to which it had succeeded. Still, Mutual Guaranty did nothing.

## IV. Effect of Plan

The confirmed plan is res judicata concerning issues and claims arising thereunder, and it establishes a necessary finality to the terms of the plan which binds the debtors and creditors. *In re NTG Indus., Inc.*, 118 B.R. 606, 610 (Bankr.N.D.Ill.1990) (citing *In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 891 F.2d 159 (7th Cir.1989)).

Once a plan of reorganization is confirmed, the bankruptcy estate, as an entity, ceases to exist unless the plan specifically provides otherwise, and all property of the estate revests in the debtor *subject to the terms and conditions imposed by the plan.* *Matter of Depew*, 115 B.R. 965, 972 (Bankr. N.D.Ind.1989) (emphasis added). It is up to the creditor to negotiate, pre-confirmation, the post-confirmation sales restrictions that will be effectuated in the confirmed plan. *In re Water Gap Village*, 99 B.R. 226, 230 (Bankr.D.N.J.1989).

The filing of the Penrods' bankruptcy petition had the effect of divesting them of all legal or equitable interests they possessed in property at the time of filing. 11 U.S.C. § 541(a)(1). Upon confirmation of their Plan, all of the property of the estate vested in the possession of the Penrods. 11 U.S.C. § 1141(b). The Penrods' Plan did not attempt to restrain them from selling their hog livestock.[13] Therefore, upon confirmation of their Plan, the Penrods had transferrable rights in the hog livestock.

Post-confirmation, Mutual Guaranty was bound by the Plan. Mutual Guaranty is barred under the confirmed Plan from enforcing its pre-confirmation lien. The only rights Mutual Guaranty has are those rights specifically granted under the terms of the confirmed Plan.

The Penrods are current on all payments required to Class 3 under the confirmed Plan. The Plan was confirmed on June 21, 1990. As of May 28, 1993, the date the Joint Stipulation of Facts was filed, the Penrods had made all payments required under the Plan. This means that throughout the two years and eleven months in which the Plan was in effect, the Penrods never missed a single payment. Moreover, prior to confirmation of the Plan, the Penrods never missed an adequate protection payment. Clearly, the Penrods have complied with the terms and conditions of the Plan.

## V. Mutual Guaranty's Contempt of Court

Mutual Guaranty filed the State Court Action based upon the belief that, post-confirmation, it remained a secured creditor. As previously mentioned, § 1141(c) of the Code, although appearing straightforward, has been interpreted differently by various jurisdictions. There is at least some split in authority over the issue. Some courts say that a secured creditor does not lose its lien merely by confirmation of a plan which does not mention the lien or secured status. The majority of the courts, taking a more practical approach, have concluded that § 1141(c) effectively extinguishes a lien that is not expressly retained under the plan.

From the standpoint of good bankruptcy practice, with one stepping back a bit so as to observe the "big picture" of what went on as the parties negotiated the Plan of Reorganization that we are considering, it is difficult to see any merit in Mutual Guaranty's position. It was present during the negotiations, approved the Plan, and apparently was comfortable with the order of confirmation. The order of confirmation brought no appeal and at this late date we assume the Plan has been substantially consummated. However, with the split of authority we can find that Mutual Guaranty's argument might appear plausible. Mutual Guaranty will not be found in contempt.

---

**13.** Apparently the Penrods' hog herd had become infected with a virus known as pseudo-rabies, with the balance thereof placed under quaran-

tine. The parties have not discussed the seriousness of this particular virus insofar as causing death of the herd.

*Conclusion*

Accordingly, Mutual Guaranty is precluded from asserting or enforcing any pre-confirmation lien that the Credit Union may have had in Penrods' hog herd.

Further, Penrods' Citation for Contempt is denied and so no order concerning attorney fees will be entered. Accordingly, the Penrods' request for attorney fees is denied. It is

SO ORDERED.